**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| INVESTMENT COMPANY INSTITUTE, *et al.*,<br><br>            Plaintiffs,<br><br>            v.<br><br>UNITED STATES COMMODITY FUTURES TRADING COMMISSION,<br><br>            Defendant. | Civil Action No. 12-00612 (BAH)<br>Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

Plaintiffs Investment Company Institute ("ICI") and Chamber of Commerce of the United States of America, two business associations, filed this lawsuit under the Administrative Procedure Act ("APA") and the Commodity Exchange Act ("CEA") challenging recent amendments to two sections, 17 C.F.R. §§ 4.5 and 4.27, of regulations promulgated by the U.S. Commodity Futures Trading Commission ("CFTC") regarding Commodity Pool Operators ("CPOs"). *See* Final Rule, Commodity Pool Operators and Commodity Trading Advisors: Compliance Obligations, 77 Fed. Reg. 11,252 (Feb. 24, 2012) ("Final Rule"), as corrected due to Fed. Reg. errors in its original publication, 77 Fed. Reg. 17,328 (Mar. 26, 2012). The challenged amendments rescind certain CPO registration and reporting exclusions, which have been in effect for less than a decade, in order to respond to significant legislative changes enacted in the aftermath of the financial crisis by the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank"). The gravamen of the plaintiffs' Complaint is that, through these amended rules, the CFTC has, without sufficient

explanation, extended its regulatory reach to registered investment companies ("RICs")[1] that engage in derivatives trading.

Notably, the plaintiffs do not dispute that the CFTC has the authority to regulate derivatives trading by RICs or that the CFTC has broad discretionary power to set eligibility criteria for entities covered by the statutory definition of CPO, which triggers registration and concomitant reporting and disclosure requirements. Rather, the plaintiffs challenge the sufficiency of the rule-making process underlying these challenged amendments. Specifically, amended Section 4.5 reinstates, with some modifications, a pre-2003 trading threshold and marketing restriction for advisers to mutual funds and RICs claiming an exclusion from the definition of CPO, and thereby from CFTC regulation. *See* 77 Fed. Reg. at 11,253–54. The new section 4.27 "imposes[s] new quarterly reporting obligations on commodity pool operators," including the advisers to mutual funds and RICs that now qualify as CPOs. Compl., ECF No. 1, ¶ 1 (citing 77 Fed. Reg. at 11,285).

In their six-count Complaint, the plaintiffs offer two legal bases for their challenges to Sections 4.5 and 4.27 of the Final Rule, arguing that, in promulgating the amendments, the CFTC, first, proceeded in an arbitrary and capricious manner in violation of the APA, and, second, failed to comply with the analysis required under Section 15(a) of the CEA. As a result,

---

[1] "RICs" are investment companies that are registered with the Securities and Exchange Commission ("SEC") pursuant to the Investment Company Act of 1940, 15 U.S.C. §§ 80a-1, *et seq*. *See* Def.'s Mem. in Supp. of Cross-Mot. for Summ. J., ECF No. 15, at 1; *see also* 15 U.S.C. § 80a-8(b) (setting forth requirements for registration of investment companies). With certain exemptions, the Investment Company Act defines an "investment company" as an issuer that "holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities" or "is engaged or proposes to engage in the business of issuing face-amount certificates of the installment type, or has been engaged in such business and has any such certificate outstanding" or "is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 per centum of the value of such issuer's total assets . . . on an unconsolidated basis." 15 U.S.C. § 80a-3. Investment companies include mutual funds, exchange traded funds, closed-end funds, and unit investment trusts. *See* Pls.' Mem. in Supp. of Mot. for Summ. J. ("Pls.' Mem."), ECF No. 8, at 3 (citing 15 U.S.C. § 80a-3(a)(1)).

the plaintiffs seek vacatur of Section 4.5 in its entirety and of Section 4.27 as applied to RICs.[2]

Pending before the Court is Plaintiffs' Motion for Summary Judgment, ECF No. 8, and

Defendant Commodity Futures Trading Commission's Cross-Motion for Summary Judgment,

and Motion to Dismiss in Part, ECF No. 15.  After hearing argument on these motions, and for

the reasons explained below, the Court will deny Plaintiffs' Motion for Summary Judgment,

grant the CFTC's Motion to Dismiss in Part, and grant the CFTC's Cross-Motion for Summary

Judgment.

## I.     FACTUAL AND LEGAL BACKGROUND

### A.     <u>The Regulation of Registered Investment Companies</u>

There is no dispute that RICs are heavily-regulated.  Indeed, the plaintiffs assert that

investment companies are "among the most highly regulated entities in the financial industry"

and are subject to all four major federal securities laws: the Investment Company Act of 1940

("ICA"), the Investment Advisors Act of 1940, the Securities Act of 1933, and the Securities

Exchange Act of 1934.  Compl. ¶¶ 2, 12 ; *see also id.*¶ 12 (noting that "'[a] mutual fund is one of

the most regulated types of companies in the United States'" (quoting Clifford E. Kirsch and

Bibb L. Stench, 1 MUTUAL FUNDS AND EXCHANGE TRADED FUNDS REGULATION, § 1:4.1 (3d ed.

2011))); *id.* ¶ 13 (noting that the ICA "'imposes an extensive federal regulatory structure on

investment companies'" (quoting Thomas P. Lemke, *et al.*, 1 REGULATION OF INVESTMENT

COMPANIES § 1.01 at 1-2 (2011)).  Underlying the plaintiffs' claims is their view that the CFTC

must demonstrate why this extant regulation is not sufficient before imposing more regulation on

RICs.  *See id.* ¶ 3 ("In adopting the rule in issue here the Commission . . . nowhere explained or

determined in any manner that SEC regulation was proving to be insufficient . . . .");  Pls.' Mem.

---

[2] While the Complaint suggests that the plaintiffs are challenging Section 4.27 on its face, the plaintiffs confirmed at
a motions hearing held on October 5, 2012 that it seeks to vacate Section 4.5 as a whole, restoring it to what it was
before the amendment, and challenges Section 4.27 only as applied to RICs.  *See* Tr. (Oct. 5, 2012) at 5, lines 6-9.

at 1 (noting that, the CFTC, in promulgating the Final Rule, "pointed to no protections resulting from its new Rule that were not already supplied by the SEC").

Investment companies are subject to some CFTC regulations that "apply broadly to market participants regardless of registration status," Pls.' Mem. in Supp. of Mot. for Summ. J. ("Pls.' Mem."), ECF No. 8, at 6 (citing 17 C.F.R. Parts 15-21), and, for most of the history of the CEA, have been required to register with the CFTC when engaging in financial activities that qualify as a commodity pool, unless they met certain eligibility restrictions for an exclusion.  The term "commodity pool operator" ("CPO") is broadly defined to include "'any' person or entity operating a business in which they solicit or accept value 'for the purpose of trading in commodity interests, including *any*' commodity future, option, swap, or certain other specified types of instruments."  Def.'s Mem. in Supp. of Cross-Mot. for Summ. J., Opp'n to Pls.' Mot. for Summ. J., and Mot. to Dismiss in Part ("Def.'s Mem"), ECF No. 15, at 5 (quoting 7 U.S.C. § 1a(11)(A)).  For a period of less than a decade since 2003, RICs have been "effectively exclude[d]" altogether from the definition of CPO, and consequently from CFTC registration of CPOs.  *See* Compl. ¶¶ 18–21; Pls.' Mem. at 16–18.  Thus, the CFTC's regulation of these entities pursuant to the Final Rule is not an entirely new regulatory scheme for RICs.

The plaintiffs here argue that registration by RICs with the CFTC is unnecessary because these entities are *already* regulated by the SEC.  The CFTC explains, however, that, given its congressional mandate to administer the CEA "to foster open, competitive, and financially sound commodity and derivatives markets," 77 Fed. Reg. at 11,278, the Final Rule regulates RICs in their capacity as CPOs operating in derivatives markets and with respect to CFTC-regulated products, rather than targeting RICs operating in SEC-regulated markets.  Thus, the CFTC's view is that the regulation of RICs operating as CPOs, after a brief period of deregulation, is not

duplicative of the SEC's regulation of investment companies.  *Id*. at 11,262 ("The Commission does not believe it is accurate to state that Congress intended to avoid oversight by both agencies, and indeed Congress clearly anticipated some overlap . . . .  Therefore, the Commission concludes that dual registration of certain entities is not irreconcilable with the Congressional intent underlying the Dodd-Frank Act.").

> ### 1.   *CFTC's Regulation of Registered Investment Companies from 1974 to 2003*

A brief review of the history of the regulation of RICs by the CFTC is helpful in understanding the context of the plaintiffs' challenges to the Final Rule.  The CFTC was established in 1974 by the Commodity Futures Trading Commission Act, Pub. L. No. 93-463, 88 Stat. 1389.  Pursuant to the CEA, the CFTC is the exclusive federal regulator of many derivative instruments and markets.  *See* 7 U.S.C. § 2(a)(1).[3]

The CEA provides that all CPOs must register with the CFTC and file such reports as the CFTC may prescribe.  7 U.S.C. § 6k.  Since the CEA "sets no minimum trading threshold for qualification as a CPO, . . . . a pooled investment vehicle operator is a statutory CPO if it trades even a single commodity, option or swap."  Def.'s Mem. at 6 (citing 7 U.S.C. § 1a(11)(A)).[4] Unless subject to an exemption or exclusion, all CPOs must register with the CFTC, *see* 7 U.S.C. § 6k, and are subject to regulatory requirements related to disclosure to investors, *see* 17 C.F.R.

---

[3] Derivatives are "financial instruments or contracts whose value rises or falls with fluctuations in the price of an underlying commodity or financial variable."  Mark Jickling & Rena S. Miller, Cong. Research Serv., R40646, Derivatives Regulation in the 111th Congress 1 (2011).  Derivatives take several forms, including futures contracts, options, and swap agreements.  *Id*.; *see also* Press Release, SEC Proposes Rules for Security-Based Swap Dealers and Major Security-Based Swap Participants (Oct. 17, 2012), *available at* http://www.sec.gov/news/press/2012/2012-210.htm ("In general, a derivative is a financial instrument or contract whose value is 'derived' from an underlying asset such as a commodity, bond, or equity security.  The instruments provide a way to transfer market risk or credit risk between two counterparties.  Derivatives are flexible products that can be designed to achieve almost any financial purpose.").

[4] The CEA defines the term "commodity" to encompass a variety of goods and articles, including "all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in."  7 U.S.C. § 1a(9).

§§ 4.21– 4.22, 4.24–4.25, recordkeeping, *id.* § 4.23, segregation of investor assets, *id.* § 4.20, and

registration and reporting obligations, *see* 7 U.S.C. §§ 6k, 6n.  *See* Pls.' Mem. at 7.  CPOs must

also become members of the National Futures Association ("NFA"), the self-regulatory

organization for the commodities industry.  *Id.*[5]

Under the CEA, the CFTC has statutory authority to exclude entities from the definition

of "CPO," thereby relieving such exempted entities from the CFTC's registration requirements

and attendant obligations.  *See* 7 U.S.C. § 1a(11)(B) ("The Commission, by rule or regulation,

may include within, or exclude from, the term 'commodity pool operator' any person engaged in

a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form

of enterprise if the Commission determines that the rule or regulation will effectuate the purposes

of this chapter.").  The CFTC "has exercised this authority over the years to expand and contract

exclusions in response to new information and changing circumstances."  Def.'s Mem at 6.

During the CFTC's early years, when entities raised questions concerning their coverage

as a CPO, the CFTC would evaluate their operations on a case-by-case basis and issue "not a

pool" letters affording relief from the CPO regulations when the entity met certain conditions,

including that the entity:

> (1) was subject to extensive Federal or State regulation; (2) would be using
> commodity interests for hedging purposes; (3) would commit only a small
> percentage of its assets — *e.g.*, 5% — to its commodity interest trading; (4) would
> not be promoted as a commodity pool; and (5) would disclose, as appropriate, the
> purpose of and limitations on its commodity interest trading.

---

[5] The plaintiffs point out that, "[l]ike [the Financial Industry Regulatory Authority ('FINRA')], the NFA has authority to promulgate rules and regulations for its members and to enforce compliance, including through suspension or disbarment," and the NFA "imposes reporting and disclosure obligations, restrictions on the content of promotional materials, and qualification testing of associated persons."  Pls.' Mem. at 7; *see id.* at 4 (explaining that FINRA "licenses the individuals and firms that distribute shares in investment companies, issues substantive regulations, and disciplines licensed entities that fail to comply with the securities law[s] or with FINRA's own rules and regulations").

49 Fed. Reg. 4778 (Feb. 8, 1984); *see also* Def.'s Mem. at 6 ("Entities receiving individual

exclusions typically used commodities for hedging risks rather than speculation; would commit

only a small percentage of assets to commodity trading; would not be promoted as a commodity

pool investment; would disclose to investors the purpose and limitations of their commodity

trading; and were subject to extensive federal or state regulation." (citing CPO & CTA:

Exemption from Registration, 49 Fed. Reg. 4778, 4779 (Notice of Proposed Rulemaking Feb. 8,

1984))).

The CFTC brought this practice to the attention of Congress when, in 1982, the Senate

Committee on Agriculture, Nutrition, and Forestry considered and rejected as "too broad" a

proposed amendment that would have exempted from the CPO definition, *inter alia*, "any person

regulated under the [ICA] . . . which utilizes less than 10 percent of its pooled assets. . . . for

futures trading and which was not established to conduct business as a commodity pool."  49

Fed. Reg. at 4779 (citing S. Rep. No. 97-384, at 79–80 (1982)).  Instead, the Committee directed

the CFTC to issue regulations "which would have the effect of exempting certain otherwise

regulated persons from registration as a CPO," only if certain conditions were met, namely, that:

> (1) the entity uses commodity futures contracts of [sic] options thereon solely for
> hedging purposes; (2) initial margin requirements or premiums for such futures or
> options contracts will never be in excess of 5 percent of the fair market value of
> the entity's assets (in the case of an investment company) or of the assets of any
> trust, custodial account or other separate unit of investment for which the entity is
> acting as a fiduciary; (3) the entity has not been and will not be, marketing
> participations to the public as or in a commodity pool or otherwise as or in a
> vehicle for trading in the commodities markets; and (4) the entity will disclose to
> each prospective participant the purpose of and limitations on the scope of the
> commodity futures or commodity option trading it conducts for such participants.

*Id.*

Prompted by this congressional directive, in 1985, the CFTC added Section 4.5, which

provided an exclusion of "certain otherwise regulated persons from the definition of the term

7

'commodity pool operator.'" CPOs; Exclusion for Certain Otherwise Regulated Persons, 50

Fed. Reg. 15,868 (Apr. 23, 1985). Under this new provision, persons, including RICs, seeking to

claim the exclusion were required to file with the CFTC a "notice of eligibility," including basic

identifying information as well as a series of representations. *Id*. at 15,875. Specifically, the

notice of eligibility had to represent that the qualifying entity: first, "[w]ill use commodity

futures or commodity options contracts solely for bona fide hedging purposes within the

meaning and intent of § 1.3(z)(1)," unless subject to an alternative representation applicable in

certain circumstances; second, "[w]ill not enter into commodity futures and commodity options

contracts for which the aggregate initial margin and premiums exceed 5 percent of the fair

market value of the entity's assets, after taking into account unrealized profits and unrealized

losses on any such contracts it has entered into;" third, "[w]ill not be, and has not been,

marketing participations to the public as or in a commodity pool or otherwise as or in a vehicle

for trading in the commodity futures or commodity options markets;" fourth, "[w]ill disclose in

writing to each prospective participant the purpose of and the limitations on the scope of the

commodity futures and commodity options trading in which the entity intends to engage;" and,

finally, "[w]ill submit to such special calls as the Commission may make to require the

qualifying entity to demonstrate compliance with the provisions of this § 4.5(c)." *Id.* at 15,883.

These provisions, including the 5% trading threshold, the marketing restriction, and the bona fide

hedging requirement, were, as the defendant notes, "precursors to the criteria contained in the

Final Rule at issue in this case." Def.'s Mem. at 7.

The plaintiffs suggest that "[i]nvestment companies responded to these requirements by

generally restricting their investment in commodity interests to meet these conditions, so that

they would not be subject to the overlapping regulatory jurisdiction of both the SEC and the

CFTC."  Pls.' Mem. at 8 (citing David E. Riggs & Charles C.S. Park, *Mutual Funds: A Banker's Primer*, 112 BANKING L.J. 757, 760-61 (1995) ("While mutual funds can, and do, invest in commodity futures contracts, their investments in such contracts are limited so as to avoid classification and regulation as [CPOs]")).

Section 4.5 remained essentially the same until 2003, when, as discussed in more detail below, prompted by further legislative action, the CFTC modified the coverage of the CPO definition.  Thus, for nearly thirty years, from 1974, when the CFTC was established, until 2003, RICs were included in the commodity pool operator ("CPO") definition in 17 C.F.R. § 4.5, and thus subject to regulation by the CFTC when they engaged in the trading of commodity interests, unless subject to exclusion as a qualifying entity after 1985.  *See* 7 U.S.C. § 6m(1).

### 2. *The Rise of "Swaps" in the Financial Industry and the Deregulation of Commodity Markets in the Early 2000s*

During the 1980s and 1990s, "swaps," a kind of derivative contract, became "pervasive." Def.'s Mem. at 7.  Swaps "are financial contracts in which two counterparties agree to exchange or 'swap' payments with each other as a result of such things as changes in a stock price, interest rate or commodity price."  SEC, THE REGULATORY REGIME FOR SECURITY-BASED SWAPS 3 (2012), *available at* http://www.sec.gov/swaps-chart/swaps-chart.pdf; *see also* Norman Menachem Feder, *Deconstructing Over-the-Counter Derivatives*, 2002 Colum. Bus. L. Rev. 677, 701-16.

The increasing use of swaps prompted a debate about whether swaps should be regulated like other derivatives.  In 2000, the defendant notes, "[p]roponents of deregulation prevailed," Def.'s Mem. at 9, with Congress passing the Commodity Futures Modernization Act ("CFMA"), Pub. L. No. 106-554, 114 Stat. 2763 (2000).  The CFMA barred the CFTC and SEC from regulating most swaps, including over-the-counter ("OTC") swaps markets.  *See* 7 U.S.C. § 2(g)

(2002); CFMA §§ 302-303, 114 Stat. at 2763A-452 (prohibiting SEC from regulating certain swaps and swap-based agreements).  Congress intended the CFMA "to streamline and eliminate unnecessary regulation," to "enhance the competitive position of United States financial institutions and financial markets," and to "reduce systemic risk."  CFMA § 2, 124 Stat. at 2763A-366.  As the defendant indicates, this "left the markets for swaps and other OTC derivatives essentially unregulated and unmonitored — effectively dark — in most respects."  Def.'s Mem. at 9–10.

In 2003, in response to the CFMA, the CFTC, diverging from its policies of the preceding thirty years, amended a number of rules, including the trading threshold and marketing restriction required in Section 4.5 for CPOs, in order to be "'consistent with the purpose and intent of the CFMA.'"  Def.'s Mem. at 10 (quoting 2003 Rule, 68 Fed. Reg. at 47,222).  Specifically, these amendments "eliminated the 5 percent ceiling for derivatives trading by RICs without CFTC registration, along with any requirement that an excluded entity trade commodities only for hedging purposes."  *Id.*  The 2003 Rule Release explained the purpose of eliminating the trading threshold and marketing restriction to, *inter alia*, "encourage and facilitate participation in the commodity markets by additional collective investment vehicles and their advisers, with the added benefit to all market participants of increased liquidity" and "increase the available range of risk management alternatives."  Additional Registration and Other Regulatory Relief for CPOs and Commodity Trading Advisors ("2003 Rule"), 68 Fed. Reg. 47,221, 47,230 (Aug. 8, 2003) (to be codified at 7 C.F.R. pt. 4).

The 2003 amendments effectively excluded RICs from the CPO definition, relieving RICs of "most CFTC oversight."  Def.'s Mem. at 1; Compl. ¶¶ 2, 21.  *See generally* 2003 Rule. This deregulation meant that "RICs could engage in unlimited derivatives trading, for any

purpose, without CFTC registration, including unlimited trading in swaps."  Def.'s Mem. at 10.

The defendant notes that swaps were not explicitly discussed in the promulgation of the 2003

amendment because the CFMA "placed those markets outside of the CFTC's jurisdiction."

Def.'s Mem. at 10.  As a result of the deregulation effected by the CFMA, "[m]any entities

invested heavily in commodity derivatives, including swaps, with limited regulatory oversight."

*Id*. (citing Final Rule, 77 Fed. Reg. at 11,255 n.35).

### B.      The Financial Crisis and Dodd-Frank Wall Street Reform and Consumer Protection Act

Within five years of the 2003 amendments to Section 4.5, the financial crisis of 2007-

2008 surfaced and began an "unraveling of this country's financial sector," which led to a "crisis

that nearly crippled the U.S. economy beginning in 2008."  S. Rep. No. 111-176 at 2, 29 (2010).[6]

This financial crisis dramatically altered the landscape of financial regulation in the United

States.  The defendant argues that the financial crisis was "widely . . . attributed in significant

part to the unchecked growth in the 2000s of dark, unregulated markets in over-the-counter

derivatives including swaps."  Def.'s Mem. at 11 (citing S. Rep. No. 111-176, at 29); *see also* S.

Rep. No. 111-176, at 29 ("By the time of the 2008 crisis, the derivatives market had grown to be

almost fifty times as large . . . . Much of this growth has been attributed to the Commodities

Futures Modernization Act of 2000 . . . ."); 156 Cong. Rec. S3605 (May 12, 2010) (Statement of

Sen. Shelby) ("[T]here is no debate that the lack of transparency in the OTC derivatives market

was a contributing factor to the financial debacle."); Final Report of the Nat'l Comm'n on the

Causes of the Fin. and Econ. Crisis in the U.S. ("Financial Crisis Report") at xxv (Jan. 2011)

("[T]he existence of millions of derivatives contracts of all types between systematically

---

[6] The Senate Banking Committee's Report documents the evidentiary basis developed over "numerous hearings" over several years from 2008 through 2010, for the policy and legal changes reflected in Dodd-Frank.  S. Rep. No. 111-176, at 9.

important financial institutions — unseen and unknown in this unregulated market — added to uncertainty and escalated panic . . . .")).[7]

In 2010, Congress responded to the "upheaval in the financial sector" by passing Dodd-Frank. Def.'s Mem. at 1–2. Dodd-Frank expanded the CFTC's jurisdiction over commodities trading by giving the CFTC "primary jurisdiction over most swaps." Def.'s Mem. at 11 (citing Dodd-Frank, title VII, 124 Stat. at 1641-1802; *id.* § 722(a); 7 U.S.C. § 2(a)(1)(A); *id.* § 1a(47)). Significantly for purposes of this case, it also repealed key provisions of the CFMA, on which the CFTC's 2003 regulatory actions were based. *See* 68 Fed. Reg. at 47,223 (noting that the 2003 rule was "consistent with the purpose and intent of the CFMA (Commodity Futures Modernization Act of 2000)"). Among the repealed CFMA provisions were those "that exclud[ed] or exempt[ed], in whole or in part, certain [commodities] transactions from [CFTC] oversight under the CEA." *See* Effective Date for Swap Regulation, 76 Fed. Reg. 35,372, 35, 375 (detailing seven provisions excluding or exempting transactions from CFTC oversight, which, under Dodd-Frank, were removed from the CEA as of July 16, 2011); *see also* Dodd-Frank, Pub. L. No. 111-203, §§ 723, 734, 124 Stat. 1675, 1718 (2010) (repealing subsections (d),

---

[7] The Financial Crisis Inquiry Commission, a ten-member panel comprised of private citizens with experience in housing, economics, finance, market regulation, banking, and consumer protection, was established as part of the Fraud Enforcement and Recovery Act, Pub. L. No. 111-21 (2009), to "examine the causes, domestic and global, of the [then] current financial and economic crisis in the United States." Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 5, 121 Stat. 1617; *see also* Financial Crisis Report at xi. The Commission published a 633-page Final Report in which the Commission, after interviewing over 700 witnesses, reviewing millions of pages of documents, and holding 19 public hearings, attempts to explain "how our complex financial system worked, how the pieces fit together, and how the crisis occurred." *Id.* at xii. In the majority opinion, the Commission concluded, *inter alia*, that "[OTC] derivatives contributed significantly to this crisis," that the "enactment of legislation in 2000 [namely, the Commodity Futures Modernization Act] to ban the regulation by both the federal and state governments of [OTC] derivatives was a key turning point in the march toward the financial crisis," and that "when the housing bubble popped and crisis followed, derivatives were in the center of the storm." *Id.* at xxiv-xxv; *see also id.* at 48 (noting that the CFMA "in essence deregulated the OTC derivatives market and eliminated oversight by both the CFTC and the SEC" and "effectively shielded OTC derivatives from virtually all regulation or oversight").

(e), (g), and (h) of Section 2 of the CEA and Sections 5a and 5d of the CEA.[8]  In removing the

exemptions and exclusions that were added in the 2000 CFMA to shield commodities

transactions from CFTC oversight, Dodd-Frank effectively unraveled the legislation that had

formed the basis for the CFTC's 2003 Rule.

The changed outlook of legislators and financial regulators following the financial crisis

regarding regulation of the financial markets generally and derivatives trading, including swaps,

specifically, is well documented.  The Congressional Research Service ("CRS") noted in 2010

that "[p]rior to the financial crisis that began in 2007, over-the-counter (OTC) derivatives were

generally regarded as a beneficial financial innovation that distributed financial risk more

efficiently and made the financial system more stable, resilient, and resistant to shocks."  MARK

JICKLING & KATHLEEN ANN RUANE, CONG. RESEARCH SERV., THE DODD-FRANK WALL STREET

REFORM AND CONSUMER PROTECTION ACT: TITLE VII, DERIVATIVES ("JICKLING & RUANE,

DERIVATIVES") 1 (2010).  "The [financial] crisis essentially reversed this view."  *Id.*  Dodd-

Frank thus "attempt[ed] to address the aspect of the OTC market that appeared most troublesome

in the crisis: the market permitted enormous exposure to risk to grow out of the sight of

regulators and other traders."  *Id.*  In contrast to the context of deregulation in which the 2003

Rule had been promulgated, Congress, in Dodd-Frank, "charg[ed] the CFTC with the task of

illuminating previously dark markets in the complex derivative instruments at the heart of the

---

[8] The exclusions or exemptions removed by Dodd-Frank included, *inter alia*, "transactions in excluded commodities between eligible contract participants and not executed or traded on a trading facility;" "principal-to-principal transactions in excluded commodities between certain eligible contract participants and executed or traded on an electronic trading facility;" "transactions subject to individual negotiation between eligible contract participants in commodities other than agricultural commodities and not executed or traded on a trading facility;" "transactions in exempt commodities between eligible contract participants and not entered into on a trading facility;" "principal-to-principal transactions in exempt commodities between eligible commercial entities . . . and executed or traded on an electronic trading facility (called exempt commercial markets . . .);" and "transactions in commodities, among other things, having a nearly inexhaustible deliverable supply or no cash market, between eligible contract participants and traded on an [exempt boards of trade, or EBOT]."  76 Fed. Reg. at 35,375 (footnotes omitted).

crisis known as 'swaps.'"  Def.'s Mem. at 2; *see also* Mary L. Schapiro, Chairman, SEC,

Opening Statement at the SEC Open Meeting (Oct. 17, 2012) ("SEC Chairman Statement"),

*available at* http://www.sec.gov/news/speech/2012/spch101712mls.htm (noting that SEC's rules

proposed under Dodd-Frank "intended to make the financial system safer, and the derivative

markets fairer, more efficient, and more transparent").

　　　　To further the congressional purposes, as outlined in the Dodd-Frank Conference Report,

*see* H.R. Rep. No. 111-517 (2010) (Conf. Rep.) ("Conference Report"), Title VII of Dodd-Frank

"amended the statutory definition of the terms 'commodity pool operator' and 'commodity pool'

to include those entities that trade swaps."  Final Rule, 77 Fed. Reg. at 11,258 & n.71 (citing 7

U.S.C. §§ 1a(10), 1a(11)).  Specifically, with respect to Title VII, the Conference Report

"establishe[d] a new regulatory framework to cover a broad range of participants and institutions

in the over-the-counter derivatives market," and stated, in relevant part: (1) that the CFTC was

"authorized to write rules for the swaps . . . market[];" and that the CFTC and SEC  (2) "shall

consult and coordinate on rules and include the prudential regulators, to the extent possible, to

assure regulatory consistency and comparability;" and (3) "will register participants in the

market including dealers, major participants, clearing agencies and organizations, exchanges,

swap execution facilities, and trade repositories."  Conference Report at 868-69.  Furthermore,

the Conference Report explained that "[e]xemptions and exclusions from registration will apply

as outlined in the report or at the discretion of the regulators."  *Id*. at 869.[9]

---

[9] Moreover, relevant to the CFTC's imposition of trading thresholds in the instant rulemaking, the Conference Report stated that regulators have authority "to impose capital on dealers and major swap participants" and "to impose margin requirements only on dealers and major participants for uncleared swaps, adding safeguards to the system by ensuring dealers and major swap participants have adequate financial resources to meet obligations." Conference Report at 869.

Dodd-Frank also established the Financial Stability Oversight Council ("FSOC"), "a new framework" intended "to prevent a recurrence or mitigate the impact of financial crises that could cripple financial markets and damage the economy."  S. Rep. No. 111-176, at 2 (2010). FSOC is "composed of the leaders of various state and federal financial regulators and is[, *inter alia*,] charged with identifying risks to the financial stability of the United States."  Final Rule, 77 Fed. Reg. at 11,252.  The CFTC is "among those agencies that could be asked to provide information necessary for the FSOC to perform its statutorily mandated duties."  *Id.*

While the 2003 regulations remained in effect following Dodd-Frank, and although the CFTC retained its authority to exclude entities from the CPO definition, the defendant argues that, "[t]he premises underlying the 2003 amendment were vitiated."  Defs.' Mem. at 25. Indeed, the plaintiffs recognized the significance of Dodd-Frank and the need, in response, for regulatory overhaul of the derivatives market.  *See* Letter from David T. Hischmann, President and CEO, Ctr. for Capital Mkts. Competitiveness of the U.S. Chamber of Commerce to David Stawick, Secretary, CFTC (Apr. 12, 2011) ("Chamber of Commerce Letter"), Admin. Record ("AR")[10] at 706, ECF No. 30-7 (stating that in July 2011, the effective date of the Dodd-Frank amendments, "the definition of a CPO will be expanded to cover both futures and swaps (*i.e.*, both exchange-traded and over-the-counter ('OTC') derivatives[)].  This expansion represents a major change to the regulation of derivatives that, in turn, necessitates a complete overhaul of the administrative rules that apply to the derivatives markets.").

---

[10] The Administrative Record ("AR") consists of 17 volumes, and 2,667 pages.  The AR is docketed at ECF No. 30. There are three videos that are part of the AR that were not converted to PDF.  Those videos are available on the web-based administrative record at Part III (Commission Events), available at http://www.cftc.gov/LawRegulation/RulemakingRecords/CPOCTARecords/index.htm.  The parties filed a Joint Appendix, which consists of 4 volumes and 1,176 pages.  The Joint Appendix is docketed at ECF No. 31.

C.      **The Challenged Rulemaking Process**

1.      *NFA Petition to Restore Section 4.5 to Be Substantially Similar to Rule in Effect Before 2003 Deregulation Due to Concerns About Mutual Funds Circumventing Federal Regulation*

Following the passage of Dodd-Frank, the NFA filed a petition of rulemaking with the CFTC requesting that, in light of developments in the commodities futures market, the CFTC amend Section 4.5 "to restore operating restrictions on registered investment companies that are substantially similar to those in effect prior to 2003."  AR at 199, ECF No. 30-3 (NFA Petition for Rulemaking to Amend CFTC Regulation 4.5, dated Aug. 18, 2010); AR at 1-2, ECF No. 30-1 (Notice of NFA Petition and Request for Comment, dated Sept. 17, 2010).  Specifically, the NFA, which has the mission of helping "ensure the protection of consumers participating in the commodity futures market," informed the CFTC that it was aware of "at least three entities filing for exclusions" under Section 4.5 for RICs that were using subsidiaries to market futures investments to retail customers.  AR at 201.  These entities were "structured differently than public commodity pools" subject to CFTC regulation, but the aim of these funds was the same, namely "targeting retail investors with in some cases minimum investment amounts of as little as $1,000 who want exposure to actively managed futures strategies."  *Id.* at 202.

The NFA noted, however, that "while these funds' offering materials indicate that the subsidiaries are subject to certain investment restrictions applicable to the funds themselves, these subsidiaries are neither commodity pools regulated by the CFTC and NFA nor registered investment companies."  *Id.* at 206.  The NFA further noted that "the prospectuses make clear that the subsidiaries are not subject to the Investment Company Act of 1940's customer protection regime."  *Id.* at 206-207.  This means that the "subsidiaries' daily operations, including their actual derivatives positions (including the positions' leverage amounts) and fees charged are not entirely transparent."  *Id.* at 207.  The NFA further explained that, in practice,

mutual funds are investing "up to 25% of [their] total assets in [a] subsidiary, and by leveraging assets at a 4 to 1 ratio, [the mutual funds are] able to achieve a managed futures exposure equal to the full net value of the fund." *Id.* at 202. In reviewing the prospectuses of these mutual funds, the NFA found that the prospectuses "omit[ted] substantial disclosures that would otherwise be mandated by" CFTC regulations ("Part 4" regulations), if these entities were required to register with the CFTC and subject to its regulations. *Id.* at 206.[11]

The NFA expressed concern over this practice and advocated for regulation of the RICs essentially as it existed before 2003, with a requirement that persons marketing commodity funds to the public, and whose funds engage in more than a *de minimis* amount of futures trading or investment, be registered as CPOs and thereby "subject to the appropriate regulatory requirements and oversight by regulatory bodies with primary expertise in commodity futures." *Id.* at 202. In light of these developments, the NFA suggested that key premises underlying the 2003 amendments to Section 4.5 — namely that entities qualifying for exception from CFTC regulation were "otherwise regulated" — may no longer be valid. *Id.* at 208. As noted, "despite the fact that these [RICs referenced above] are marketed to retail customers as an actively managed futures fund, they are not subject to customer protection rules entirely comparable to the CFTC's Part 4 Regulations and NFA's Compliance Rules." *Id.* The NFA expressed concern that even more CPOs would "avail themselves of this alternative registered investment company structure," thereby circumventing regulation. *Id.*[12]

---

[11] The NFA explained, for example, that "the prospectuses do not include detailed information about the fund's futures commission merchants and potential conflicts of interest, and performance information for the fund (assuming it has three months performance) or other funds operated by the investment adviser." AR at 206. "Additionally, to the extent the funds' prospectuses state that the fund and/or subsidiary will invest in other actively managed futures trading programs, the prospectuses provide little information about these managed futures trading programs, these programs' fee structures, and the past performance results of their trading managers." *Id.*

[12] The NFA's concerns about mutual funds circumventing federal regulation were later echoed in a December 2011 letter from the Chairman and Ranking Minority Member of the Senate Permanent Subcommittee on Investigations

Accordingly, the NFA requested that the CFTC amend Section 4.5 to require that a person claiming exclusion from the CPO definition, and thus from CFTC regulation, represent in its notice of eligibility: first, that its RIC will not be marketing futures participations to the public as a commodity pool or otherwise as a vehicle for trading in the commodity futures or commodity options markets, and, second, that it will use commodity futures or commodity options contracts only for bona fide hedging purposes. *Id.* at 209. With respect to positions held for non-bona fide hedging purposes, the NFA proposed that a person seeking an exclusion must represent that the "aggregate initial margin and premiums required to establish such positions will not exceed five percent of the liquidation value of the qualifying entity's portfolio, after taking into account unrealized profits and unrealized losses on any such contracts it has entered into." *Id.* The NFA recognized that, if the CFTC were to adopt these amendments, Section 4.5 "will impose the same operating restrictions on [RICs] that were in place prior to 2003," and the NFA thus suggested that the CFTC provide time for RICs to comply with these reinstated regulations. *Id.*

## 2. *Notice of Proposed Rulemaking and Notice and Comment Period*

Following receipt of the NFA Petition, and in light of the financial crisis and the passage of Dodd-Frank, on February 11, 2011, the CFTC issued a Notice of Proposed Rulemaking, proposing to amend Section 4.5 to narrow the definitional exclusion for RICs and to rescind or modify other exemptions and exclusions. *See* Notice of Proposed Rulemaking, Commodity Pool

---

to the IRS that is part of the Administrative Record. *See* AR at 2661-2666. The letter highlighted that the IRS had allowed 72 private companies to employ the very strategy of concern to the NFA. Many of these funds "set up offshore wholly-owned [controlled foreign corporations (CFCs)] that exist solely to trade commodities in the futures and swaps markets." *Id.* at 2663. "The mutual funds typically organize their CFCs as Cayman Island subsidiaries; operate them as shell entities with no physical offices or employees of their own; and run the CFCs' commodity portfolios from their U.S. offices," stated the Chairman. *Id.* "That the Cayman CFCs are empty shells designed to allow U.S. mutual funds to create commodity related investment portfolios, run by their own U.S. employees, is openly acknowledged." *Id.* The letter urged the IRS to cease issuing private letter rulings that allowed mutual funds to evade federal regulations and "make unlimited indirect investments in commodities." *Id.* at 2666.

Operators and Commodity Trading Advisors: Amendments to Compliance Obligations, 76 Fed.
Reg. 7976 (Feb. 11, 2011) ("2011 NPRM").  The Notice of Proposed Rulemaking emphasized
that "[f]ollowing the recent economic turmoil, and consistent with the tenor of the provisions of
the Dodd-Frank Act, the [CFTC] has reconsidered the level of regulation that it believes is
appropriate with respect to entities participating in the commodity futures and derivatives
markets" and "believes that it is necessary to rescind or modify several of its exemptions and
exclusions to more effectively oversee its market participants and manage the risks that such
participants pose to the markets." *Id.* at 7977.

In light of this changed environment, the CFTC stated that its proposed amendments to
existing regulations were intended to achieve four primary objectives:  first, "bring the
Commission's CPO and CTA [Commodity Trading Advisors] regulatory structure into
alignment with the stated purposes of the Dodd-Frank Act;" second, "encourage more congruent
and consistent regulation of similarly-situated entities among Federal financial regulatory
agencies;" third, "improve accountability and increase transparency of the activities of CPOs,
CTAs, and the commodity pools that they operate or advise;" and, fourth, "facilitate a collection
of data that will assist the FSOC, acting within the scope of its jurisdiction, in the event that the
FSOC requests and the Commission provides such data." *Id*. at 7978.  The CFTC noted that the
"added benefit" of the amendments would be that the CFTC would be able to "more efficiently
deploy its regulatory resources and to more expeditiously take necessary action to ensure the
stability of the commodities and derivatives markets, thereby promoting the stability of the
financial markets as a whole." *Id*.[13]

---

[13] To satisfy these objectives, the Commission proposed to:

(A) Require the periodic reporting of data by CPOs and CTAs regarding their direction of
commodity pool assets; (B) identify certain proposed filings with the Commission as being

Accordingly, the CFTC proposed amendments, in relevant part, to "revise the requirements for determining which persons should be required to register as a CPO under § 4.5" and "require the filing of certified annual reports by all registered CPOs." *Id.*  With respect to Section 4.5, the CFTC proposed "to reinstate the pre-2003 operating criteria consistent with the language proposed by NFA in its petition." *Id.* at 7984; *see also id.* at 7983.  The CFTC noted that

> Prior to amendments that the Commission made in 2003, § 4.5 required entities to file a notice of eligibility that contained a representation that the use of commodity futures for non bona fide hedging purposes will be limited to five percent of the liquidation value of the qualifying entity's portfolio and that the entity will not market the fund as a commodity pool to the public.

*Id.*  The CFTC explained that when it adopted the 2003 amendments, its decision was "driven by comments claiming that the 'otherwise regulated' nature of the qualifying entities . . . would provide adequate customer protection." *Id.* at 7983 (internal quotation marks omitted) (quoting 68 Fed. Reg. 47,221, 47,223 (Aug. 8, 2003)).

In 2010, however, the CFTC "became aware of certain registered investment companies that were offering [a] series of de facto commodity pool interests claiming exclusion under § 4.5." *Id.*  The CFTC discussed this practice with market participants and the NFA, which subsequently submitted its petition for rulemaking, requesting the reinstatement of pre-2003 restrictions in Section 4.5. *See id.*

---

afforded confidential treatment; (C) revise the requirements for determining which persons should be required to register as a CPO under § 4.5; (D) require the filing of certified annual reports by all registered CPOs; (E) rescind the exemptions from registration under §§ 4.13(a)(3) and (a)(4); (F) require periodic affirmation of claimed exemptive relief for both CPOs and CTAs; (G) require an additional risk disclosure statement from CPOs and CTAs that engage in swaps transactions; and (H) make certain conforming amendments to the Commission's regulations . . . .

76 Fed. Reg. at 7978.

Under the approach proposed in the 2011 NPRM, a person seeking an exclusion under Section 4.5 would have to represent that its RIC "[w]ill use commodity futures or commodity options contracts, or swaps solely for bona fide hedging purposes,"[14] and any such portions held for non-bona fide hedging purposes would "not exceed five percent of the liquidation value of the qualifying entity's portfolio, after taking into account unrealized profits and unrealized losses on any such contracts it has entered into." *Id.* at 7989 (quoting 75 Fed. Reg. 56,997, 56,998 (Sept. 17, 2010)).  Furthermore, the 2011 NPRM also included a marketing restriction, wherein a person seeking an exclusion under Section 4.5 must represent that the RIC "[w]ill not be, and has not been, marketing participations to the public as or in a commodity pool or otherwise as or in a vehicle for trading in (or otherwise seeking investment exposure to) the commodity futures or commodity options markets." *Id.* (quoting 75 Fed. Reg. 56,997, 56,998 (Sept. 17, 2010)).[15]

The CFTC believed that this approach "would limit the possibility of entities engaging in regulatory arbitrage whereby operators of otherwise regulated entities that have significant

---

[14] "Bona fide hedging" is defined in Rule 1.3(z)(1).  The definition of bona fide hedging is discussed in more detail *infra*.

[15] Specifically, in relevant part, the Commission proposed that Section 4.5(c)(2) be amended as follows:

> (iii) Furthermore, if the person claiming the exclusion is an investment company registered as such under the Investment Company Act of 1940, then the notice of eligibility must also contain representations that such person will operate the qualifying entity as described in [Rule] 4.5(b)(1) in a manner such that the qualifying entity: (a) Will use commodity futures or commodity options contracts solely for bona fide hedging purposes within the meaning and intent of [Rule] 1.3(z)(1); Provided, however, That in addition, with respect to positions in commodity futures or commodity option contracts that may be held by a qualifying entity only which do not come within the meaning and intent of [Rule] 1.3(z)(1), a qualifying entity may represent that the aggregate initial margin and premiums required to establish such positions will not exceed five percent of the liquidation value of the qualifying entity's portfolio, after taking into account unrealized profits and unrealized losses on any such contracts it has entered into; and, Provided further, That in the case of an option that is in-the-money at the time of purchase, the in-the-money amount as defined in [Rule] 190.01(x) may be excluded in computing such [five] percent; (b) Will not be, and has not been, marketing participations to the public as or in a commodity pool or otherwise as or in a vehicle for trading in (or otherwise seeking investment exposure to) the commodity futures or commodity options markets.

76 Fed. Reg. at 7984 (alterations in original) (footnotes omitted) (quoting NFA Petition, 75 Fed. Reg. 56,997, 56, 998 (Sept. 17, 2010)).

holdings in commodity interests would avoid registration and compliance obligations under the Commission's regulations," and that, furthermore, this approach would be "appropriate to ensure consistent treatment of operators of commodity pools regardless of registration status with other regulators." *Id*. at 7,984. This approach would also mean that "entities that operate funds that are de facto commodity pools" would have to report their activities on Form CPO-PQR, as required by Section 4.27, discussed below. *Id*.

The 2011 NPRM further addressed the need for transparency in the financial markets that had been a congressional goal in the Dodd-Frank Act. Specifically, the CFTC noted that "[f]ollowing the recent economic turmoil, and consistent with the tenor of the provisions of the Dodd-Frank Act," the CFTC decided that the reporting requirements currently in place "do not provide sufficient information regarding [the] activities [of CPOs and CTAs] for the Commission to effectively monitor the risks posed by those participants to the commodity futures and derivatives markets." *Id*. at 7978. Thus, the CFTC proposed a new Section 4.27, which would require any CPO or CTA that is "registered or required to be registered" to "complete and submit Forms CPO-PQR or CTA-PR, respectively, with [the] NFA as the Commission's delegatee" or official custodian of the records. *Id*. The CFTC explained in the proposed rulemaking that it proposed these forms in order to collect information from CPOs and CTAs.[16] These forms, which were developed "in consultation with other financial regulators tasked with overseeing the

---

[16] Concurrently, the CFTC and SEC issued a joint proposed rulemaking that will streamline reporting requirements by mandating that private fund advisers registered with the SEC and as CPOs or CTAs with the CFTC file Form PF "to satisfy certain CFTC systemic risk reporting requirements." *See* Joint Proposed Rule, Reporting by Investment Advisers to Private Funds and Certain Commodity Pool Operators and Commodity Trading Advisers on Form PF, 76 Fed. Reg. 8068, 8069 (Feb. 11, 2011). The notice of proposed rulemaking at issue in this case noted that

> In an effort to eliminate duplicative filings, proposed § 4.27(d) would allow certain CPOs and/or CTAs that are also registered as private fund advisers with the SEC pursuant to the securities laws to satisfy certain of the Commission's systemic reporting requirements by completing and filing the appropriate sections of Form PF with the SEC with respect to advised private funds.

76 Fed. Reg. at 7977.

financial integrity of the economy," would, *inter alia*, enable the CFTC to identify whether any

commodity pools "warrant additional examination or scrutiny." *Id.*[17]

The proposed rulemaking outlined numerous questions for comment, in response to

which the CFTC received more than 60 comments during the public comment period. *See* Def.'s

Mem. at 13; AR at 211-874; *see, e.g.*, AR at 863, 865-66, ECF No. 30-9 (Comment from U.S.

Senate (Dianne Feinstein, Carl Levin) (Nov. 30, 2011)) (noting that "[i]t is critical that the CFTC

reinstate the [pre-2003] Section 4.5 limitations . . . so that the CFTC may properly safeguard

investors and regulate the burgeoning growth of commodity related mutual funds" and that

"[u]ntil the proposed amendments are adopted and effective CFTC oversight is in place,

investors will continue to be vulnerable to commodity related mutual funds that operate with

inadequate federal oversight"). The CFTC also held a "Roundtable" on the proposed

rulemaking, in which the plaintiffs participated. *See* AR at 1144–1403 (Transcript of Roundtable

(July 6, 2011)); *id.* at 1404–08 (Website Notice of Roundtable and Agenda). According to the

CFTC, during an administrative process that lasted over a year, it "reviewed and considered all

comments, met with interested parties, and considered all available evidence" before voting to

approve the Final Rule. Def.'s Mem. at 13.

### 3.   *The Final Rule*

Following the extensive notice-and-comment period, in February 2012, the CFTC voted

four to one to amend Sections 4.5 and 4.27 in the Final Rule.[18]   *See* CPOs & CTAs: Compliance

---

[17] The Commission was sensitive to the potential regulatory burden of the proposed new Section 4.27 and eschewed a one-size-fits-all reporting requirement. Instead, under the proposed rule, "[t]he amount of information that a CPO or CTA will be required to disclose on proposed Forms CPO-PQR and CTA-PR will vary depending on both the size of the operator or advisor and the size of the advised pools" and "[t]his tiered approach to disclosure acknowledges the fact that smaller operators, advisors, and pools are less likely to present significant risk to the stability of the commodities futures and derivatives markets and the financial market as a whole, and therefore, such entities should have a lesser compliance burden." 77 Fed. Reg. at 7978.

Obligations, 77 Fed. Reg. 11,252 (Feb. 24, 2012), as corrected due to Fed. Reg. errors in its original publication, 77 Fed. Reg. 17,328 (Mar. 26, 2012).  Specifically, the CFTC amended the definitional exclusion in 17 C.F.R. § 4.5 to require RICs to register with the CFTC as CPOs if the RIC engages in non-hedging commodity trading exceeding certain thresholds, or if it makes statements that the CFTC regards as marketing a product as a vehicle for trading in the commodity market.  *See* 77 Fed. Reg. at 11,283.  It also added Section 4.27, 17 C.F.R. § 4.27, to require additional reporting by all registered CPOs.  *See* 77 Fed. Reg. at 11,285–86; *id.* at 11,287 (Appendix A to Part 4 (Form CPO-PQR)).

The Final Rule acknowledged the over-arching congressional purposes in the Dodd-Frank Act following the financial crisis of 2007 and 2008, "to reduce risk, increase transparency, and promote market integrity within the financial system by, inter alia, enhancing the [CFTC's] rulemaking and enforcement authorities with respect to all registered entities and intermediaries subject to the Commission's oversight."  *Id.* at 11,252.  The CFTC noted that "[f]ollowing the

---

[18] The statements of two Commissioners are included in the Final Rule – the statement of Chairman Gary Gensler and the statement of the sole dissenting Commissioner, Commissioner Jill E. Sommers.  *See* 77 Fed. Reg. at 11,343–44.  Chairman Gensler explained that the final rule "enhances transparency in a number of ways and increases customer protections through amendments to the compliance obligations for CPOs and CTAs" acting in the derivatives market "for both futures and swaps," noting that "[t]his rule reinstates the regulatory requirements in place prior to 2003 for registered investment companies that trade over a de minimis amount in commodities or market themselves as commodity funds."  *Id.* at 11,343.  Commissioner Sommers, on the other hand, dissented from the Final Rule, which she apparently believed should have been "limited . . . to address[ing] the issues raised by the NFA's petition," an approach that she "would have supported."  *Id.*  While Commissioner Sommers concluded that "[a]s it is, we have gone far beyond what was needed to resolve NFA's concerns," she did not explain which aspects of the amendments prompted her dissent since the NFA expressly called for reinstatement of the pre-2003 eligibility requirements for RICs to qualify for exclusion from the CPO definition.  Notwithstanding her express support for the NFA approach, and consequently for narrowing the exclusion in the CPO definition, she is critical of the Final Rule because Congress "was aware of the existing exclusions and exemptions for CPOs when it passed Dodd-Frank" and yet "did not direct the Commission to narrow their scope."  *Id.* at 11,344.  She also noted her skepticism of the soundness of both the agency's cost-benefit analysis and reasoning for the Final Rule, noting that there is "no evidence to suggest that inadequate regulation of commodity pools was a contributing cause of the [financial] crisis, or that subjecting entities to a dual registration scheme will somehow prevent a similar crisis in the future."  *Id.*  These comments by Commissioner Sommers, which are cited no less than ten times by the plaintiffs, *see* Compl. ¶¶ 4, 45, 53, Pls.' Mem. at 17, 18, 37, 43, Pls.' Resp. to Def.'s Cross-Mot. for Summ. J., ECF No. 26, at 5, 25, 42-43, are difficult to reconcile not only with her general support for the NFA's call for reinstatement of pre-2003 regulation but also with the reality of the sweeping reach of Dodd-Frank, which expanded the CFTC's jurisdiction over swaps, and Congress's clear intent for regulatory agencies, including the CFTC, to shine a light on parts of the market, such as OTC derivatives, that went unregulated in the period leading up to the financial crisis.

recent economic turmoil, and consistent with the tenor of the provisions of the Dodd-Frank Act, the Commission reconsidered the level of regulation that it believes is appropriate with respect to entities participating in the commodity futures and derivatives markets." *Id.*

Accordingly, the Final Rule implemented the changes it had proposed to Section 4.5 by rescinding the 2003 exclusion from registration as a CPO for RICs that would otherwise qualify, and modifying the criteria to be eligible for exclusion from the CPO definition to limit such eligibility to those collective investment vehicles that engage in a "de minimis amount of derivatives trading." *Id.* at 11,255. To be eligible for exclusion from the CPO definition, under amended Section 4.5, a RIC's trading in commodity futures, commodity options, or swaps may not exceed one of two trading thresholds and must comply with a marketing restriction. With respect to the trading thresholds, a RIC may be eligible for an exclusion if its non-bona fide hedging trading in commodity futures, commodity options, or swaps does not exceed two thresholds: (1) five percent or less of the liquidation value of the entity is used for aggregate initial margin and premiums; or (2) the aggregate net notional value of commodity futures, commodity options contracts, or swaps positions does not exceed 100 percent of the liquidation value of the pool's portfolio. *See id.* at 11,283. These amendments, the plaintiffs acknowledge "largely mirror[] the pre-2003 trading threshold, although the net notional test is new." Pls.' Mem. at 10; *see also* Compl. ¶ 37 (noting that the Final Rule "adopted the trading threshold largely as proposed in the [Notice of Proposed Rulemaking]" and added the "'alternative net notional test'"). The Final Rule also differs from the pre-2003 regulation because it includes trading in swaps as part of the trading thresholds.[19]

---

[19] The plaintiffs contend that the "trading threshold" will be significantly more restrictive than the pre-2003 trading threshold because of the Final Rule's inclusion of trading in swaps. *See* Pls.' Mem. at 10.

The new marketing restriction under Section 4.5 precludes an entity claiming an exclusion from "marketing participations to the public as or in a commodity pool or otherwise as or in a vehicle for trading in the commodity futures, commodity options, or swaps markets."  77 Fed. Reg. at 11,283.  As the plaintiffs also acknowledge, "[a]side from the inclusion of swaps, this is essentially identical to the pre-2003 marketing threshold."  Pls.' Mem. at 10.[20]

In justifying these changes to Section 4.5, the CFTC noted that while excluding certain investment companies from CFTC oversight was once "appropriate because such entities engaged in relatively little derivatives trading, and dealt exclusively with qualified eligible persons, who are considered to possess the resources and expertise to manage their risk exposure, . . . changed circumstances warrant revisions to these rules."  77 Fed. Reg. at 11,275. As support for revising the rules, the CFTC identified, *inter alia*, "increased derivatives trading activities by entities that have previously been exempted from registration with the Commission, such that entities now offering services substantially identical to those of registered entities are not subject to the same regulatory oversight" as well as the mandate from Dodd-Frank "to manage systemic risk and to ensure safe trading practices by entities involved in the derivatives markets, including qualified eligible persons and other participants in commodity pools."  *Id.*

The CFTC also emphasized that there is currently "no source of reliable information regarding the general use of derivatives by registered investment companies," and the need for

---

[20]  In response to comments from plaintiff ICI and others requesting the CFTC's guidance on the marketing restriction, the CFTC identified seven factors that "are indicative of marketing a registered investment company as a vehicle for investing in commodity futures, commodity options, or swaps," namely (1) "[t]he name of the fund;" (2) "[w]hether the fund's primary investment objective is tied to a commodity index;" (3) "[w]hether the fund makes use of a controlled foreign corporation for its derivatives trading;" (4) "[w]hether the fund's marketing materials, including its prospectus or disclosure document, refer to the benefits of the use of derivatives in a portfolio or make comparisons to a derivatives index;" (5) "[w]hether, during the course of its normal trading activities, the fund or entity on its behalf has a net short speculative exposure to any commodity through a direct or indirect investment in other derivatives;" (6) "[w]hether the futures/options/swaps transactions engaged in by the fund or on behalf of the fund will directly or indirectly be its primary source of potential gains and losses;" and (7) "[w]hether the fund is explicitly offering a managed futures strategy."  77 Fed. Reg. at 11,259.

that information in order for the newly created FSOC to "perform its statutorily mandated duties," *id*. at 11,252, 11,275, which include "collect[ing] information from member agencies," "monitor[ing] the financial services marketplace in order to identify potential threats to the financial stability of the United States," and "identify[ing] gaps in regulation that could pose risks to the financial stability of the United States."  Dodd-Frank, § 112(a)(1).[21]

The Final Rule also included new Section 4.27, requiring CPOs and CTAs to report information to the CFTC on forms CPO-PQR and CTA-PR, respectively.  *Id*. at 11,266–67, 11,285–86.  The CFTC stated in the Final Rule that, "[b]y creating a reporting regime that makes the operations of commodity pools more transparent to the Commission, the Commission is better able to identify and address potential threats."  *Id*. at 11,281.

In issuing the Final Rule, the CFTC noted that it had heeded the advice of several commenters, including plaintiff ICI, that "obligations flowing from CFTC registration needed further consideration in order to avoid conflict with certain SEC requirements for RICs."  Def.'s Mem. at 16.  Accordingly, the CFTC, concurrently with issuing the Final Rule, issued a notice of proposed rulemaking to harmonize the CFTC and SEC's compliance requirements.  *See* Proposed Rule, Harmonization of Compliance Obligations for RICs Required to Register as CPOs, 77 Fed. Reg. 11,345 (Feb. 24, 2012) ("Harmonization Proposed Rulemaking").  This

---

[21] The purpose of the FSOC is: (1) "to identify risks to the financial stability of the United States that could arise from the material financial distress or failure, or ongoing activities, of large, interconnected bank holding companies or nonbank financial companies, or that could arise outside the financial services marketplace;" (2) "to promote market discipline, by eliminating expectations on the part of shareholders, creditors, and counterparties of such companies that the Government will shield them from losses in the event of failure;" and (3) "to respond to emerging threats to the stability of the United States financial system."  Dodd-Frank § 112(a)(1).  The FSOC is authorized to "receive . . . and . . . request the submission of, any data or information from the Office of Financial Research, member agencies, and the Federal Insurance Office, as necessary . . . (A) to monitor the financial services marketplace to identify potential risks to the financial stability of the United States; or (B) to otherwise carry out any of the provisions of this title."  *Id*. § 112(d)(1); *see also* Conference Report at 870 ("If the Board [of Governors of the Federal Reserve System] determines that the standards imposed by the SEC or the CFTC or the enforcement actions of such agencies are insufficient, then [FSOC] can require the SEC or CFTC to impose additional standards or take additional enforcement actions.").  The CFTC "is dedicated to assisting FSOC," and emphasized that "these final regulations are essential for the Commission to be able to fulfill that role effectively because the Commission cannot protect against risks of which it is not aware."  77 Fed. Reg. at 11,281.

harmonization process encompasses compliance obligations in Part 4 of the CFTC's regulations,

which are subject to change during the harmonization process, but does *not* include the

requirements set forth in Section 4.27, which the CFTC considers to be *final* and not subject to

change in the pending harmonization rulemaking.  *See* Def.'s Mem. at 16.[22]

The effective date for Section 4.5 of the Final Rule is April 24, 2012, and for Section

4.27 is July 2, 2012, but compliance with these challenged sections was postponed.  *See* 77 Fed.

Reg. at 11,252; Tr. (Oct. 5, 2012) at 45, lines 10-22.  Pursuant to the Final Rule, compliance with

Section 4.5 for registration purposes only "shall be required not later than the later of December

31, 2012, or 60 days after the effective date of the final rulemaking further defining the term

'swap.'"  77 Fed. Reg. at 11,252.  Since the Final Rule on Swaps was published on August 13,

2012, *see* Joint Final Swaps Rule, Further Definition of "Swap," "Security-Based Swap," and

"Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement

Recordkeeping, 77 Fed. Reg. 48,208, compliance with Section 4.5 for registration purposes is

December 31, 2012.  *See* 77 Fed. Reg. at 11,252.

While the effective date for Section 4.27 is specified in the Final Rule to be July 2, 2012,

compliance with Section 4.27 for "[e]ntities required to register due to the amendments to § 4.5"

is required, along with the other "recordkeeping, reporting, and disclosure requirements pursuant

to part 4 of the Commission's regulations within 60 days following the effectiveness of a final

rule implementing the Commission's proposed harmonization effort . . . ."  *Id.*; *see also id*. at

11,271 (already registered CPOs must comply with Section 4.27 by September 15, 2012 or

---

[22] The suspended compliance obligations in Part 4 "impose certain risk disclosure, reporting, and recordkeeping obligations on registered CPOs," 77 Fed. Reg. at 11,346, as set forth in Section 4.21 (regarding delivery and acknowledgement requirements); Section 4.22 (regarding periodic account statements and financial reports); Section 4.23 (regarding maintenance of books and records); Section 4.24 (regarding cautionary statements and other disclosures); Section 4.25(c)(2)-(5) (disclosures by pools in operation for less than 3 years); and Rule 4.26 (regarding timing of disclosures to investors).  *See* Def.'s Mem. at 16 n.9.

December 15, 2012, depending upon the amount of assets under management).  As the defendant

made clear in supplemental briefing after the motions hearing, "the Final Rule release suspends

compliance with Rule 4.27 for registered investment companies, pending a final harmonization

rule. . . . [I]nvestment companies required to register with the Commission pursuant to the

amendments to Rule 4.5 need not comply with Rule 4.27 until after the harmonization rule

becomes effective."  Def.'s Reply to Pls.' Supp. Resp., ECF No. 40, at 3.  Thus, although the

defendant considers the requirements set forth in Section 4.27 to be final, compliance with

Section 4.27 is suspended, as is compliance with the part 4 requirements that are subject to

change in the joint harmonization rulemaking.  There is no estimated date for the Final Rule on

harmonization.  *See* Tr. (Oct. 5, 2012) at 46, lines 18-21.

### D.    Procedural History

The plaintiffs brought this lawsuit to challenge the CFTC's amendments to Sections 4.5

and 4.27, arguing, *inter alia*, that, in issuing the Final Rule, "the Commission did not even

mention — much less provide a reasoned explanation for abandoning — the rationale behind its

2003 amendment eliminating the trading and marketing thresholds."  Compl. ¶ 39.  The plaintiffs

request that the Court, through an injunction, restore the CFTC's 2003-era financial regulations

with respect to RICs.  Specifically, the plaintiffs allege in five counts that there was, on the part

of the CFTC, (1) insufficient evaluation of costs and benefits in violation of the CEA and the

APA (Count I); arbitrary and capricious agency action in violation of the APA by (2) requiring

registration and regulation of investment companies and their advisors (Count II);

(3) establishing registration thresholds and adopting related requirements and restrictions (Count

III); and (4) failing to provide interested persons a sufficient opportunity to meaningfully

participate in the rulemaking (Count IV); and (5) arbitrary and capricious agency action in

requiring Form CPO-PQR in violation of the CEA and APA (Count V).  The plaintiffs set forth

their requested relief in Count VI, arguing that "[t]hese injuries will be redressed only if this Court declares the Rule's amendments to Sections 4.5 and 4.27 and related provisions unlawful and enjoins the CFTC from implementing those amendments." Compl. ¶ 81.

The parties filed cross-motions for summary judgment, *see* ECF Nos. 8, 15, and presented oral argument on these motions. *See* Minute Order (Oct. 5, 2012). At the request of the parties, the Court allowed supplemental briefing on issues raised in the motions hearing. *See id*. The cross-motions are now pending before the Court.

## II. STANDING

The defendant does not challenge the standing of the plaintiffs, but the Court must nevertheless address this issue in order to be satisfied that it has jurisdiction. "'No principle,' the Supreme Court has repeatedly explained, 'is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Coalition for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 146 (D.C. Cir. 2012) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). "The doctrine of standing 'is an essential and unchanging part of the case-or-controversy requirement.'" *Id*. (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "Organizations can establish standing in one of two ways. First, they can demonstrate injury, causality, and redressability in the same way as a traditional plaintiff. Second, an organization can have representational standing . . . ." *Schrader v. Holder*, 831 F. Supp. 2d 304, 308 (D.D.C. 2011) (internal citations omitted).

The plaintiffs are two business associations that assert representational standing. Plaintiff ICI "is an association that represents United States registered investment companies, including open-ended investment companies (the most common kind of investment company, which includes mutual funds and most exchange-traded funds), closed-end investment companies, and

unit investment trusts."  Compl. ¶ 6.  Members of ICI purport to manage total assets of $13.3 trillion and "serve more than 90 million shareholders."  *Id*.  Plaintiff Chamber of Commerce is "the world's largest business federation," representing 300,000 members directly and claiming to indirectly "represent[] the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country."  *Id*. ¶ 7.

In order "[t]o establish representational standing, an association must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'"  *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011) (quoting *Ass'n of Flight Attendants-CWA v. United States DOT*, 564 F.3d 462, 464 (D.C. Cir. 2009)); *Bhd. of R.R. Signalmen v. Surface Transp. Bd.*, 638 F.3d 807, 809 n.2 (D.C. Cir. 2011); *Theodore Roosevelt Conservation P'Ship v. Salazar*, 616 F.3d 497, 507 (D.C. Cir. 2010).  The plaintiffs claim that they have standing to bring this suit "on behalf of their members because investment companies and their advisers that would be directly affected by the Rule would have standing to sue in their own right; because the interests they seek to protect are germane to their purpose; and because neither the claim asserted nor the relief requested requires an individual member to participate in this suit."  Compl. ¶ 10 (citing *Theodore Roosevelt Conservation P'Ship v. Salazar*, 616 F.3d 497, 507 (D.C. Cir. 2010)).

The Court concludes that ICI has standing to bring its claims on behalf of its members. First, the RICs who are members of ICI would clearly have standing to bring their claims in their own right.  In order "[t]o establish constitutional standing, a plaintiff must show (1) an injury in

fact that is 'concrete and particularized' and 'actual or imminent;' (2) that the injury is 'fairly

traceable' to the defendants' challenged conduct; and (3) that the injury is likely to be 'redressed

by a favorable decision.'" *Chaplaincy of Full Gospel Churches v. United States Navy (In re*

*Navy Chaplaincy)*, No. 12-cv-5027, 2012 U.S. App. LEXIS 22556, at *9 (D.C. Cir. Nov. 2,

2012) (quoting *Lujan*, 504 U.S. at 560-61).  RICs engaging in certain trading activity will be

subject to CFTC regulation and will face the relative increased regulatory burden and the

associated costs of that regulation.  Furthermore, any injury to ICI would be "fairly traceable" to

the CFTC's amendments to Sections 4.5 and 4.27, and a "favorable decision" that vacates

Section 4.5 and vacates Section 4.27 as applied to RICs would fully redress the RICs' injury.

Second, since ICI represents RICs and is concerned for their interests in the marketplace, the

interests ICI seeks to protect in this lawsuit are germane to its purpose.  Finally, neither the claim

nor the relief sought requires the participation of the individual RICs represented in this lawsuit

by the ICI.

Accordingly, the Court finds that ICI has established standing on behalf of its members.

*See, e.g.*, *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 507 (concluding that "[b]ecause

[the organizations'] claims and requested relief are germane to their organizational purposes and

do not require any individual member to participate in the lawsuit, the organizations have

standing to sue on behalf of those members").  Since "only one plaintiff must have standing," the

Court need not consider the standing of the Chamber of Commerce.  *In Re Navy Chaplaincy*,

2012 U.S. App. LEXIS 22556, at *18.

## III.    STANDARD OF REVIEW

Under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), a reviewing court shall

"hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."  "This is a

'deferential standard' that 'presumes the validity of agency action.'"  *WorldCom, Inc. v. FCC*,

238 F.3d 449, 457 (D.C. Cir. 2001) (quoting *Southwestern Bell Tel. Co. v. FCC*, 168 F.3d 1344,

1352 (D.C. Cir. 1999)).

 "[W]hen an agency action is challenged[, t]he entire case on review is a question of law,

and only a question of law."  *Marshall County Healthcare Auth. v. Shalala*, 988 F.2d 1221, 1226

(D.C. Cir. 1993).  The district court must "review the administrative record to determine whether

the agency's decision was arbitrary and capricious, and whether its findings were based on

substantial evidence."  *Forsyth Mem. Hosp., Inc. v. Sebelius*, 639 F.3d 534, 537 (D.C. Cir. 2011),

*reh'g en banc denied*, 652 F.3d 42 (2011), *cert. denied*, 132 S. Ct. 1107 (2012).  In this regard,

the Court cannot "affirm an agency decision on a ground other than that relied upon by the

agency."  *Manin v. Nat'l Transp. Safety Bd.*, 627 F.3d 1239, 1243 (D.C. Cir. 2011).

 "[A]lthough the 'scope of review under the "arbitrary and capricious" standard is narrow

and a court is not to substitute its judgment for that of the agency,' [the Court] must nonetheless

be sure the Commission has 'examined the relevant data and articulated a satisfactory

explanation for its action including a rational connection between the facts found and the choice

made."  *Chamber of Commerce v. SEC*, 412 F.3d 133, 140 (D.C. Cir. 2005) (quoting *Motor

Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  In

determining whether the agency's action was arbitrary and capricious, the Court shall determine

whether its action was a "product of reasoned decisionmaking" or whether the agency "failed to

consider an important aspect of the problem, offered an explanation for its decision that runs

counter to the evidence before the agency, or is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise."  *State Farm*, 463 U.S. at 43, 52.  In

applying this standard to an agency rule that, as here, reflects a clear change in policy and is designed to be implemented in stages and to facilitate oversight and reduce risks rather than directly remediate a known harm, several other legal principles guide the Court's analysis.

First, "[t]he 'arbitrary and capricious' standard is particularly deferential in matters implicating predictive judgments." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009). "In circumstances involving agency predictions of uncertain future events, complete factual support in the record for the Commission's judgment or prediction is not possible or required since a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency." *Id.* (citations and internal quotation marks omitted); *see also Chamber of Commerce v. SEC*, 412 F.3d at 142 (explaining that "'[w]hen . . . an agency is obliged to make policy judgments where no factual certainties exist or where facts alone do not provide the answer, [the Court's] role is more limited; we require only that the agency so state and go on to identify the considerations it found persuasive'") (quoting *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1221 (D.C. Cir. 1999)); *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 300 (D.C. Cir. 2003) (noting that "[w]hile it is true that the [agency] must do more than simply posit the existence of the disease sought to be cured, the Commission is entitled to appropriate deference to predictive judgments that necessarily involve the expertise and experience of the agency") (citations and internal quotation marks omitted).

Second, where an agency action presents a change from a prior agency action, the Supreme Court has explained that there is "no basis in the Administrative Procedure Act or in our opinions for a requirement that all agency change be subjected to more searching review." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009). The Supreme Court has "'neither held nor implied that every agency action representing a policy change must be

justified by reasons more substantial than those required to adopt a policy in [the] first instance.'" *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1037 (D.C. Cir. 2012) (quoting *Fox Television Stations*, 556 U.S. at 514). Indeed, "[a]n agency's view of what is in the public interest may change, either with or without a change in circumstances." *State Farm*, 463 U.S. at 57.

"To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position." *Fox Television Stations*, 556 U.S. at 515 (emphasis in original). Furthermore, an "agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970). "[I]f an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute." *Id.* Thus, the agency "must show that there are good reasons for the new policy. But it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Fox Television Stations*, 556 U.S. at 515. "[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.* (emphasis in original). Nevertheless, an agency "[s]ometimes" must "provide a more detailed justification," for example when "its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests." *Id.* "In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.*

Finally, in promulgating regulations, agencies may proceed incrementally.  Indeed, "[a]gencies, like legislatures, do not generally resolve massive problems in one fell regulatory swoop."  *Massachusetts v. EPA*, 549 U.S. 497, 524 (2007) (rejecting "erroneous assumption that a small incremental step, because it is incremental, can never be attacked in a federal judicial forum"); *see also Nat'l Ass'n of Broadcasters v. FCC*, 740 F.2d 1190, 1207 (D.C. Cir. 1984) (explaining that "[i]n classifying economic activity, agencies, while entitled to less deference than Congress, nonetheless need not deal in one fell swoop with the entire breadth of a novel development; instead, 'reform may take place one step at a time, addressing itself to the phase of the problem which seems most acute to the [regulatory] mind'") (quoting *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489 (1955)).  Furthermore, the APA "recognizes that agency rulemaking can occur in stages, and that review of initial steps should generally be deferred until the regulatory process is complete."  *American Portland Cement Alliance v. EPA*, 101 F.3d 772, 776 (D.C. Cir. 1996).

## IV.    DISCUSSION

The plaintiffs argue that the amendments to Sections 4.5 and 4.27 failed to satisfy the requirements of the CEA and were arbitrary and capricious under the APA.  Specifically, in their Motion for Summary Judgment, they contend that the CFTC adopted the Final Rule without considering its necessity, *see* Pls.' Mem. at 20-31, arbitrarily reversed its prior 2003 rulemaking with no meaningful justification, *see id.* at 32-34; imposed significant and unnecessary costs while making it impossible to fully determine those costs as required by law, *see id.* at 34-39; failed to provide reasoned justification for significant aspects of its rule, *see id.* at 39-44; and, with respect to the marketing restriction, did not offer the public a meaningful opportunity to comment, *see id.* at 44-45.

The defendant responds that it is entitled to judgment as a matter of law because it complied with all aspects of the APA and CEA.  *See* Def.'s Mem. at 21.  The defendant argues, in particular, that (1) the Final Rule has a reasoned basis in the record and was a "sensible and prudent response to the central role of the unregulated, opaque derivatives markets in the financial crisis of 2007-2008 and Congress' charge to the CFTC to regulate the swaps market and guard against systemic risk," *id*. at 18; (2) the specific criteria that the CFTC adopted for Section 4.5 were all reasonable, *see id*. at 18-19; (3) there is no basis for disrupting the amendment to Section 4.27, which "appropriately balances the burdens of reporting with the Commission's need for information from entities that are operating in its jurisdictional markets," *id*. at 19-20; and (4) the CFTC properly considered the costs and benefits of issuing the Final Rule, *see id*. at 20-21.  The defendant also argues that (5) the plaintiffs' "challenges to other compliance obligations, such as recordkeeping and disclosure, should be dismissed because they are unripe."  *Id*. at 20.

The Court first addresses (A) the plaintiffs' inter-related allegations that the CFTC adopted the Final Rule without adequately considering the benefits and costs of the Final Rule, including, in the discussion of the CFTC's perceived benefits, the plaintiffs' challenges that the agency failed to justify the necessity of the rule or reversal of the agency's 2003 version of Section 4.5.  The Court then turns to the plaintiffs' arguments that the CFTC failed to (B) provide reasoned justification for specific aspects of the Final Rule, and (C) comply with its obligations under the CEA.  Finally, the Court considers (D) the plaintiffs' allegations that the CFTC did not provide a meaningful opportunity for interested persons to participate in the rulemaking particularly regarding the marketing restriction.

A.        **Benefits and Costs of the Final Rule**

Courts "review [an agency's] cost-benefit analysis deferentially." *Nat'l Ass'n of Home Builders*, 682 F.3d at 1040.  As the D.C. Circuit has explained, "the Supreme Court has emphasized that 'a court is *not* to substitute its judgment for that of the agency.'" *Consumer Elecs. Ass'n. v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003) (Roberts, J.) (emphasis added) (quoting *State Farm*, 463 U.S. at 43).  This is "a point [the D.C. Circuit has] taken to be 'especially true when the agency is called upon to weigh the costs and benefits of alternative policies.'" *Consumer Elecs. Ass'n*, 347 F.3d at 303 (emphasis added) (quoting *Center for Auto Safety v. Peck*, 751 F.2d 1336, 1342 (D.C. Cir. 1985) (Scalia, J.)).  Indeed, "cost-benefit analyses epitomize the types of decisions that are most appropriately entrusted to the expertise of an agency."  *Office of Communication of United Church of Christ v. FCC*, 707 F.2d 1413, 1440 (D.C. Cir. 1983).  The Court's role, instead, is "to determine whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Center for Auto Safety*, 751 F.2d at 1342 (citations and internal quotation marks omitted).

Furthermore, "'in view of the complex nature of economic analysis typical in the regulation promulgation process, [the petitioners'] burden to show error is high.'"  *Nat'l Ass'n of Home Builders*, 682 F.3d at 1040 (quoting *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 563 (D.C. Cir. 2002)).  "The APA imposes no general obligation on agencies to produce empirical evidence.  Rather, an agency has to justify its rule with a reasoned explanation." *Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009).  Where an agency has acknowledged public comments regarding costs of the new rule and concluded that such costs are "justified by gains in other areas," the agency has sufficiently taken into consideration these facts.  *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 211 (D.C. Cir. 2007) (noting that the agency had "acknowledged comments . . . [regarding]

the burden of changes" and, while the petitioner "may disagree with this policy balance, . . . it does not reflect a failure to consider relevant factors").

The plaintiffs are correct that the CFTC "has a special responsibility under the Commodity Exchange Act to consider the costs and benefits of its actions."  Pls.' Mem. at 1. Section 15(a) of the CEA requires the CFTC to evaluate the costs and benefits of proposed rules in light of five enumerated factors that address generally protection of the market players and consumers, efficient competition and transparency of pricing, and the stability of the market in terms of risk management.  Specifically, the five factors are "(A) considerations of protection of market participants and the public; (B) considerations of the efficiency, competitiveness, and financial integrity of futures markets; (C) considerations of price discovery; (D) considerations of sound risk management practices; and (E) other public interest considerations."  7 U.S.C. § 19(a).

The defendant addressed each of these five factors in considering the Final Rule.  *See* 77 Fed. Reg. at 11,280-81 (applying the five factors set forth in § 15(a) of the CEA to the registration provisions); *id.* at 11,281 (applying the five factors to the financial reporting provisions).  Nonetheless, the plaintiffs insist that the defendant "entirely failed to discharge these statutory directives."  Compl. ¶ 56.  Since the plaintiffs use their allegation about the CFTC's alleged failure to conduct an adequate "cost-benefit" analysis as an overarching theme for their myriad complaints about the Final Rule, the Court structures its analysis by first discussing the plaintiffs' specific allegations related to the CFTC's "benefits"-side analysis before turning to the plaintiffs' allegations related to the "costs"-side analysis, and then, finally, addressing the plaintiffs' specific argument that the CFTC failed to evaluate the costs and benefits of the Final Rule under the CEA.  The Court concludes that the CFTC fulfilled its

responsibilities under both the CEA and the APA to evaluate the costs and benefits of the Final

Rule.

### 1.     *Benefits-Side Analysis*

The plaintiffs argue that the CFTC failed to provide a justification for the Final Rule by

a) not identifying a problem that needed fixing, *see* Pls.' Mem. at 20-21, 28-31, b) not justifying

a change in policy from the 2003 deregulation, *see id*. at 32-34, c) not justifying its amendments

in light of existing regulations, *see id*. at 22-28, and d) targeting RICs for registration, with

concomitant burdensome additional requirements, while retaining the exemption in the CPO

definition for other entities in Section 4.5, *see id*. at 31.   The Court addresses each of these

arguments *seriatim* below.

### a)     *The CFTC Provided a Reasoned Justification for Amendments to Sections 4.5 and 4.27.*

The Court begins its analysis with the plaintiffs' threshold complaint that the CFTC

has not "identif[ied] some problem that is being addressed" by the Final Rule, and thus fails to

demonstrate the benefit of the CFTC's action.   Pls.' Mem. at 22; *see also id*. (citing *Business

Roundtable v. SEC*, 647 F.3d 1144, 1154 (D.C. Cir. 2011) (vacating an SEC rule because the

SEC "failed adequately to address whether the regulatory requirements of the [Investment

Company Act] reduce the need for, and hence the benefit to be had from" additional regulation).

The Court agrees with the plaintiffs that "[r]equiring such an explanation makes good sense: If a

rule is unnecessary, it is difficult to say how the rule can yield any benefit, or how its benefits

can possibly justify its costs."   *Id*.   The Court cannot agree with the plaintiffs, however, that this

error "pervades the rulemaking at issue here."   *Id*.   Rather, the defendant correctly points out that

the plaintiffs' claims are premised on the "false assertion" that the CFTC did not identify

problems in the market or other reasons to justify a reversal of the 2003 deregulation of certain

investment companies.  Defs.' Mem. at 18.  The plaintiffs' suggestion that there was "no evidence of a real problem" in the Final Rule is disingenuous.  Pls.' Mem. at 21 (quoting *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 841 (D.C. Cir. 2006)).  Indeed, as explained below, the agency properly considered the "important aspect[s] of the problem" addressed by the Final Rule, *State Farm*, 463 U.S. at 43, and provided a reasoned justification for its amendments to Sections 4.5 and 4.27.  While the plaintiffs insist that the CFTC failed to justify the amendments, the plaintiffs simply ignore or make light of the Final Rule's clear outline of both the benefits of and the multiple justifications for the amendments.

In the Final Rule, the CFTC states that:

> [R]egistration [pursuant to Section 4.5] provides two significant interrelated benefits.  First, registration allows the Commission to ensure that entities with greater than a de minimis level of participation in the derivatives markets meet minimum standards of fitness and competency.  Second, registration provides the Commission and members of the public with a direct means to address wrongful conduct by participants in the derivatives market.

77 Fed. Reg. at 11,277.  The CFTC views these benefits of "enhancing the quality of entities operating within the market, and the screening of unfit participants from the markets" as "substantial, even if unquantifiable."  *Id*.  "Through registration, the Commission will be better able to protect the public and markets from unfit persons and conduct that may threaten the integrity of the markets subject to its jurisdiction."  *Id*.  The CFTC also notes the tangential public policy benefits that would flow from registration, including improving the quality of market participants, strengthening the derivatives industry by lessening lost business from customer dissatisfaction, and reducing litigation.  *Id*.[23]

---

[23] The CFTC notes that "[w]hile [the plaintiffs] tend to blur the various requirements for operating as a CPO, the Final Rule discusses registration separately from financial reporting and from other compliance obligations . . . because, in the Commission's view, registration itself has independent value."  Def.'s Mem. at 27 (citing, *e.g.*, *CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135, 139-40 (2d Cir. 1977) (noting that "[r]egistration is the kingpin of the statutory machinery, giving the Commission the information about participants in commodity

With respect to the data collection requirements of Section 4.27, the CFTC stated that the benefits would include an "increase [in] the amount and quality of information available to the Commission regarding a previously opaque area of investment activity," which would allow the CFTC to "tailor its regulations to the needs of, and risks posed by, entities in the market, and to protect investors and the general public from potentially negative or overly risky behavior." *Id.* at 11,281. The CFTC further explained that Dodd-Frank "charged the Commission, as a member of FSOC and as a financial regulatory agency, with mitigating risks that may impact the financial stability of the United States." *Id.* "By creating a reporting regime that makes the operations of commodity pools more transparent to the Commission, the Commission is better able to identify and address potential threats." *Id.* While the CFTC noted that the "total benefit of risk mitigation as it pertains to the overall financial stability of the United States is not quantifiable, . . . it is significant insofar as the Commission may be able to use this data to prevent further future shocks to the U.S. financial system." *Id.*

The overarching benefits of the amendments to the Final Rule at issue here are supported by a number of specific justifications for the amendments, including:

(1) To "eliminate informational 'blind spots'" in the derivatives markets. Final Rule, 77 Fed. Reg. at 11,275; *see also id.* at 11,278 n.224, 11,279, 11,280, 11,281; 2011 NPRM, 76 Fed. Reg. at 7988;

(2) To enable the CFTC to carry out a "more robust mandate" after Dodd-Frank "to manage systemic risk and to ensure safe trading practices by entities involved in the derivatives markets," including swap markets. Final Rule, 77 Fed. Reg. at 11,275; *see also id.* at 11,277, 11,279; 2011 NPRM, 76 Fed. Reg. at 7976-78;

(3) To "better understand the participants in the derivatives markets" and the "interconnectedness of all market participants," in order for the CFTC to "better assess potential threats to the soundness of derivatives markets and

---

trading which it so vitally requires to carry out its other statutory functions of monitoring and enforcing the [CEA]")).

thus the financial system of the United States." Final Rule, 77 Fed. Reg. at 11,280; *see also id*. at 11,281; 2011 NPRM, 76 Fed. Reg. at 7978, 7988;

(4) To enable the CFTC to perform its duties as a member of the new FSOC established in Dodd-Frank. *See* Final Rule, 77 Fed. Reg. at 11,252-53; *see also id*. at 11,281; 2011 NPRM, 76 Fed. Reg. at 7977-78;

(5) To respond to Congress' amendment in Dodd-Frank to the definition of "commodity pool operator" to include investment vehicles participating in swaps. Final Rule, 77 Fed. Reg. at 11,258; *see also id*. at 11,260; 2011 NPRM, 76 Fed. Reg. at 7976;

(6) To address information indicating that RICs were operating as *de facto* unregulated commodity pools. *See* Final Rule, 77 Fed. Reg. at 11,254; *see also* 11,258-59; 2011 NPRM, 76 Fed. Reg. at 7983-84;

(7) To ensure that operators of all commodity pool operators, including swap-trading entities newly brought within the statutory definition, meet minimum standards of competency. *See* Final Rule, 77 Fed. Reg. at 11,254, 11,277; and

(8) To ensure "consistent treatment of CPOs regardless of their status with respect to other regulators." 77 Fed. Reg. at 11,254.

The plaintiffs dismiss the above-cited justifications, most of which are cited by the defendant as "separate and compelling reasons for circumscribing the 2003 blanket exclusion of RICs from CFTC regulation," Def.'s Mem. at 21-22, as "cherry-picked" portions of the Final Rule. Pls.' Resp. to Def.'s Cross-Mot. for Summ. J. ("Pls.' Resp."), ECF No. 26, at 22. The plaintiffs argue that the CFTC has "conjure[d] new rationales to replace the justifications provided in the Rule Release." *Id*. at 7. This argument is unavailing, however, since the justifications cited are all plainly in the Final Rule and cited as justifications for the Final Rule.

Undeterred, the plaintiffs further argue unconvincingly that these justifications fail. *See id*. at 22-28. The plaintiffs also contend that the "[t]he Commission . . . could not simply invoke the financial crisis and conclude that any subsequent regulation is justified; its Release had to explain why the financial crisis justifies the Rule adopted here." *Id*. at 5. Yet, there is no legitimate debate that derivatives trading and the risks associated with that activity were

significant contributors to the financial crisis.  *See, e.g.*, S. Rep. 111-176 at 29 (noting that

"[m]any factors led to the unraveling of this country's financial sector," but citing as "a major

contributor to the financial crisis . . . the unregulated over-the-counter ("OTC") derivatives

market," which grew by a factor of "almost fifty times" between 1994 and 2008 largely because

of the CFMA of 2000, which "explicitly exempted OTC derivatives, to a large extent, from

regulation by the" CFTC and "limited the SEC's authority to regulate certain types of OTC

derivatives."); *see id*. at 2-3 (citing among the shortcomings that the FSOC was intended to

address that "investment banks and other types of nonbank financial firms operated with

inadequate government oversight" during the financial crisis).

To the extent that the plaintiffs criticize the CFTC for insufficiently establishing a link

between derivatives trading by investment companies and the financial crisis, the plaintiffs

ignore that one of the stated reasons for the Final Rule, as mandated by Dodd-Frank, is to

"eliminate informational 'blind spots'" in the derivatives markets.  *See* Final Rule, 77 Fed. Reg.

at 11,275; *see also id*. at 11,278 n.224, 11,279, 11,280, 11,281; 2011 NPRM, 76 Fed. Reg. at

7988.  The amendments requiring RICs to register and report information to the CFTC is

intended to fulfill this very goal.  Furthermore, as the CFTC notes, the Final Rule "is not a

punishment for past conduct."  Def.'s Reply to Pls.' Resp. to Def.'s Cross-Mot. for Summ. J.

("Def.'s Reply"), ECF No. 29, at 5.  Instead, it is intended, going forward, "to ensure that the

Commission can adequately oversee the commodities and derivatives markets and assess market

risk associated with pooled investment vehicles under its jurisdiction."  *Id*. (quoting 2011

NPRM, 76 Fed. Reg. at 7977).  The Court will not disturb the agency's ruling as arbitrary and

capricious for finalizing a prophylactic rule to prevent problems before they arise in the agency's

blind spots.  *See Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009)

(explaining that "agencies can, of course, adopt prophylactic rules to prevent potential problems before they arise" and "[a]n agency need not suffer the flood before building the levee.").

The CFTC not only provided justifications for the rulemaking, but also explained the significance of the potential benefits of the rulemaking.  The CFTC acknowledged that "systemic benefits of this nature cannot meaningfully be quantified."  Def.'s Mem. at 54 (citing 77 Fed. Reg. at 11,277, 11,281 (noting that "enhancing the quality of entities operating within the market" is "unquantifiable" and that the "total benefit of risk mitigation as it pertains to the overall financial stability of the United States is not quantifiable").  The CFTC did, however, explain in the Final Rule that the purported benefits of the rule are "significant insofar as the Commission may be able to use this data to prevent further future shocks to the U.S. financial system."  77 Fed. Reg. at 11,281.  The Court does not believe that any more exacting benefit calculation needs to be made in this case, particularly, here, where the agency is fulfilling expanded regulatory responsibilities mandated under Dodd-Frank.  The Court "see[s] no basis, at least under the deferential arbitrary and capricious test, for overruling [the CFTC's] considered judgment of the need for this regulation."  *Stilwell*, 569 F.3d at 519.

As further explained below, the Court finds that the CFTC not only stated sufficient reasons for amending Sections 4.5 and 4.27, but also provided adequate justification for the shift from its 2003 regulatory position in removing the blanket exception for RICs in particular.

b)      *The CFTC Justified Replacing the 2003 Amendment.*

The plaintiffs argue aggressively that the amendments to the Final Rule represent a "summary reversal" of the CFTC's position in a 2003 rulemaking that investment companies were "otherwise regulated" entities that did not require additional regulation by the CFTC.  Pls.' Mem. at 1.  The plaintiffs allege that the CFTC "[a]rbitrarily [r]eversed its [p]rior [2003] [r]ulemaking [w]ith [n]o [m]eaningful [j]ustification."  *Id.* at 31.  Thus, the plaintiffs urge the

Court that the CFTC violated the APA by "abruptly chang[ing] course without a meaningful explanation of the grounds for reversal." *Id*. The CFTC counters that the plaintiffs not only ignore the "two sea-changing events of modern financial history that the Commission could not ignore," namely, the financial crisis and Dodd-Frank, but also ignore the language in the Final Rule and the Notice of Proposed Rulemaking that specifically explains the connection between these events and the Final Rule. Def.'s Mem. at 23.

At the outset, to the extent that plaintiffs' challenge to the sufficiency of the specific reasons for the CFTC's shift from its 2003 position reflects an effort to hold the CFTC to a higher standard than it would be held to in creating a new rule, this effort is misguided. The law simply does not require any heightened scrutiny of an agency change in position. *See, e.g.*, *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1036 (D.C. Cir. 2012) (rejecting petitioners' argument that "under the APA, the agency has to be held to a higher standard" when it changes course, and noting that an agency's "reevaluation of which policy would be better in light of the facts . . . is well within an agency's discretion"); *Dillmon v. NTSB*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (explaining that the "APA does not impose a heightened standard of review upon an agency to justify its departure from precedent"). Thus, in evaluating the CFTC's shift from its 2003 regulatory position, this Court has the "responsibility to ensure that [the agency] satisfied the core requirement . . . an agency must meet when changing course: it must 'provide reasoned explanation for its action,' which 'would ordinarily demand that it display awareness that it is changing position.'" *Nat'l Ass'n of Home Builders*, 682 F.3d at 1038. It bears repeating that an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-15 (2009) (emphasis in original). Rather, "it suffices that the new policy is permissible under the

statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."  *Id.* (emphasis in original).  The Court concludes that the CFTC has amply satisfied those factors here.

As part of its justification for the shift in regulatory approach, the Final Rule notes the CFTC's history of exempting certain categories of entities, including RICs, "from the CPO and CTA registration requirement set forth in Section 4m(1) of the CEA, . . . because such entities engaged in relatively little derivatives trading, and dealt exclusively with qualified eligible persons, who are considered to possess the resources and expertise to manage their risk exposure."  77 Fed. Reg. at 11,275.  The Final Rule bluntly expresses "the Commission's judgment" that "changed circumstances warrant revisions to these rules."  *Id.*  Among the "changed circumstances" cited in the Final Rule warranting "a new registration and data collection regime for CPOs and CTAs," *id.*, are: (1) "increased derivatives trading activities by entities that have previously been exempted from registration with the Commission;" (2) "entities now offering services substantially identical to those of registered entities are not subject to the same regulatory oversight;" (3) "the Dodd-Frank Act has given the Commission a more robust mandate to manage systemic risk and to ensure safe trading practices by entities involved in the derivatives markets, including qualified eligible persons and other participants in commodity pools;" and (4) "while the Commission must execute this mandate, there currently is no source of reliable information regarding the general use of derivatives by registered investment companies."  *Id.*  This language from the Final Rule shows that the Commission was consciously changing its position and set forth reasonable justifications for the changes.

The plaintiffs get carried away by their own rhetoric to say that the defendant has "identified no problems or abuses that had arisen since 2003 that justified regulation," Pls.'

Mem. at 1, in the face of a financial meltdown due in significant part to derivatives trading, lack of transparency, and the lack of regulatory oversight, all of which prompted enactment of Dodd-Frank.  *See, e.g.*, JICKLING & RUANE, DERIVATIVES at 1.  It is indisputably correct, as the CFTC notes, that the recent financial crisis "has widely been attributed in significant part to the unchecked growth in the 2000s of dark, unregulated markets in over-the-counter derivatives, including swaps."  Def.'s Mem. at 11.  Nonetheless, the plaintiffs dismiss what they characterize as "[t]he Commission's [n]ewfound [r]eliance [o]n Dodd-Frank [a]nd [t]he Financial Crisis," Pls.' Resp. at 5, to contend that these events do "not explain why the financial crisis justifies regulation of investment companies *in particular*," *id*. at 6 (emphasis in original).  In other words, the plaintiffs attack the CFTC's rescission of the 2003 version of Section 4.5 for not sufficiently tying derivatives trading activity by RICs to the changed circumstances.

This myopic view of the Final Rule is fundamentally incorrect for at least three reasons discussed in more detail below: first, the Final Rule effectuates the congressional purpose in Dodd-Frank to provide more transparency and regulatory oversight of derivatives trading generally; second, the statutory bases for the 2003 version of Section 4.5 were repealed and other contextual considerations underlying the 2003 version have substantially changed; and, finally, the CFTC was aware of potentially risky but unregulated CPO trading activity by RICs, providing further justification for the prophylactic measures reflected in the Final Rule.

First, the CFTC properly understood a "primary purpose of the Dodd-Frank Act" to be "promotion of transparency in the financial system, particularly in the derivatives market."  77 Fed. Reg. at 11,277.  The fact that the CFTC correctly articulated this purpose is confirmed by examination of the Senate Banking Committee Report for Dodd-Frank, which stated that "[a] major lesson from the crisis is the importance of transparency in financial markets."  S. Rep.

111-176 at 38.  The registration of entities, including RICs, engaging in more than *de minimis* trading in derivatives and swaps is an entirely rational and appropriate mechanism to effectuate this congressional purpose.  This is particularly so because, as pointed out in the Final Rule, there "currently is <u>no</u> source of reliable information regarding the general use of derivatives by" RICs.  *Id*. at 11,275 (emphasis added).  It is evident from the Final Rule that, in response to the financial crisis, the CFTC decided that it was necessary to shine a light on "blind spots" in the financial markets, including RICs.  *Id*.  Thus, the Final Rule was not focused on RICs *per se* but on entities, including RICs, which engage in unregulated CPO activities.

The registration and reporting requirements in the Final Rule are designed not only to assist the CFTC in its regulatory oversight function but also to facilitate the CFTC's newly envisioned role in providing information to the FSOC, which is tasked to, *inter alia*, "monitor emerging risks to U.S. financial stability," and address shortcomings of the then-extant regulatory framework "that left the government ill-equipped to handle the recent financial crisis."  S. Rep. 111-176 at 2.  As noted, cited among the shortcomings that the FSOC was intended to address was that "investment banks and other types of nonbank financial firms operated with inadequate government oversight."  *Id*. at 2-3.  This runs directly counter to the plaintiffs' argument that the financial crisis was not tied to investment banks.  *See, e.g.*, Pls.' Mem. at 12 (noting that plaintiff ICI had, in their comment on the instant rule, pointed out "that there was no evidence that investment companies' participation in the commodities markets posed *any* risk, much less systemic risk") (emphasis in original).  Thus, the CFTC was consciously changing its regulations in light of the new context, which was well within the agency's discretion.

Second, the plaintiff's criticism of the CFTC's purportedly insufficient justification for its shift from its 2003 regulation appears even more vacuous upon examination of the changes in Dodd-Frank that repealed parts of the CFMA.  The repeal of these CFMA provisions effectively eliminated the statutory underpinning for the 2003 amendments.  *See* 2003 Rule, 68 Fed. Reg. at 47,223 (noting that the "relief the Commission is proposing . . . is consistent with the purpose and intent of the CFMA").  That these provisions added in the CFMA, which excluded swap transactions from CFTC oversight under the CEA, were repealed by Dodd-Frank signifies a sufficiently changed circumstance to warrant a change in regulation of previously exempt entities, such as RICs, that engage in derivatives and swaps trading.  *See* Effective Date for Swap Regulation, 76 Fed. Reg. 35,372, 35,375 (detailing seven provisions excluding or exempting transactions from CFTC oversight, which, under Dodd-Frank, were removed from the CEA as of July 16, 2011).

The plaintiffs' complaint that the CFTC justified the Final Rule on the grounds that investment companies were increasingly participating in commodity markets, *see* Pls.' Mem. at 32 (citing 77 Fed. Reg. at 11,275), when "this was *the very result the Commission sought to achieve* in its 2003 rulemaking," *id*. (emphasis in original), amounts to crocodile tears.  Indeed, when the CFTC issued the blanket exclusion of RICs from the CPO definition in 2003, it did so taking into account the "current investment environment," consistently with the CFMA's deregulatory policy, which was based on assumptions that have now been called into serious question.  2003 Rule, 68 Fed. Reg. at 47,223.  For example, when promulgating the 2003 Rule and evaluating its potential costs, the CFTC stated that deregulation "should have no effect" on the "financial integrity . . . of the commodity futures and options market."  *Id*. at 47,230.  The recently experienced financial crisis, attributed at least in part to the risky, opaque and

unregulated derivatives trading, have patently undermined that assumption.  The response in

Dodd-Frank, not only by repealing key provisions of the CFMA but also by expanding both the

CFTC's jurisdiction to regulate derivatives and swaps trading and the statutory definition of a

CPO to include entities that trade swaps, constitutes a changed context at the core of the CFTC's

stated justification for its rulemaking.  *See* 2011 NPRM, 76 Fed. Reg. at 7977 ("Following the

recent economic turmoil, and consistent with the tenor of the provisions of the Dodd-Frank Act,

the Commission has reconsidered the level of regulation that it believes is appropriate with

respect to entities participating in the commodity futures and derivatives market.").

Finally, the Final Rule is intended to apply a consistent regulatory regime to entities

engaged in CPO activities in order to ensure the transparency required by Dodd-Frank and to

protect consumers and the financial markets.  The CFTC, in promulgating the Final Rule,

explained, for example, that it was requiring registration and reporting from "certain previously

exempt CPOs" because "[t]he sources of risk delineated in the Dodd-Frank Act with respect to

private funds are also presented by commodity pools."  77 Fed. Reg. at 11,253.  To the extent

that the plaintiffs insist that the CFTC must tie abusive and risky swap activity to RICs *before*

regulating them, *see, e.g.*, Pls.' Resp. at 5, they are just wrong.  Given the goal of Dodd-Frank to

protect the integrity of U.S. financial markets by promoting more regulatory transparency, the

CFTC is justified in taking prophylactic measures to treat entities engaging in the same regulated

activity in the same manner.

Furthermore, the Final Rule made clear the CFTC's concerns, based upon consultations

with the NFA and the NFA's petition, that RICs were, in fact, using controlled foreign

corporations ("CFCs"), or subsidiaries, to operate unregistered and unregulated CPOs.  77 Fed.

Reg. at 11,254 (noting the NFA Petition, the Final Rule indicates "that registered investment

companies should not engage in such activities without Commission oversight and that such oversight was necessary to ensure consistent treatment of CPOs regardless of their status with respect to other regulators"). The NFA's petition was corroborated by the CFTC during a Roundtable, which is described in the Final Rule. *Id*. at 11, 259. Specifically, the Final Rule outlines the CFTC's "understanding that [RICs] invest up to 25 percent of their assets in the CFC, which then engages in actively managed derivatives strategies." *Id*. While the Final Rule indicates no opposition to RICs' use of CFCs for trading in commodity interests, when that trading falls within the CPO statutory definition, the Final Rule requires registration. *See id*.

In sum, it was a reasonable response to "changed circumstances" reflected in legislation and potentially risky financial market activities, for the CFTC to revise the 2003 version of Section 4.5 in order to learn more about commodities derivatives trading through registration and data reporting requirements for previously exempt entities engaging in such trading activities, including RICs.[24]  *See, e.g., Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 300 (D.C. Cir. 2003) (noting that "[w]hile it is true that the [agency] must do more than simply posit the existence of the disease sought to be cured, the Commission is entitled to appropriate deference to predictive judgments that necessarily involve the expertise and experience of the agency") (citations and internal quotation marks omitted). Accordingly, the plaintiffs' arguments that the CFTC violated the APA by "arbitrarily reversing" its 2003 position are unavailing.

---

[24] In deconstructing the Final Rule, the plaintiffs fail to acknowledge the overarching benefits of transparency and risk-mitigation that come from the registration and reporting requirements in Sections 4.5 and 4.27. For example, in criticizing the CFTC's approach to cost-benefit analysis, they cite a portion of a speech by CFTC Chairman Gary Gensler, in which he notes that the Commission has arranged for the White House Office of Information and Regulatory Affairs to provide "technical assistance" to the Commission, particularly with respect to cost-benefit analysis. Pls.' Mem. at 22 n.11 (citing Gary Gensler, Chairman, CFTC, Open Commission Meeting for Consideration of Rules Implementing the Dodd-Frank Act (May 10, 2012) ("Gensler Statement"), available at http://cftc.gov/PressRoom/SpeechesTestimony/genslerstatement051012. Yet, they omit the immediate follow-on portion of the statement, in which the Chairman states that the CFTC "should take into account the overall benefits to the American public and market participants of increased transparency, lower risk and help to protect against another crisis." Gensler Statement. "I don't know that anyone needs to be reminded," the Chairman stated, "but eight million Americans lost their jobs in that crisis." *Id*.

c)    *Dodd-Frank Sanctions Dual Regulation by CFTC and SEC.*

The plaintiffs also press an argument that the Final Rule is not justified because the

CFTC's regulation of derivatives trading by RICs would be redundant of regulation by the SEC.

*See* Pls.' Mem. at 22.  The plaintiffs argue that the CFTC failed to show that existing regulations

are inadequate, and that the amendments layer unnecessarily CFTC and NFA regulation "on top

of existing regulation by the SEC and FINRA, thus subjecting investment companies to four

separate regulatory masters."  *Id*. at 31; *see also id*. (citing *American Equity*, 613 F.3d at 179)

(vacating an SEC rule because of the failure of the SEC to "to determine whether, under the

existing regime, sufficient protections existed").[25]  They note that the portions of the Final Rule

discussing Section 4.5 "do not cite a *single* SEC statute or regulation" and that the CFTC does

not "identify which SEC and FINRA regulations affect investment companies and their service

providers" nor "determine which CFTC and NFA regulations overlap with those existing

regulations."  Pls.' Mem. at 22-23.  Therefore, the plaintiffs argue, the Final Rule was

"incomplete because it fails to determine whether, under the existing regime, sufficient

protections existed."  *Id*. at 23 (quoting *American Equity*, 613 F.3d at 179).

The defendant, however, *did* address this very issue in the Final Rule.  The CFTC noted

that the SEC itself had acknowledged that "it had not developed a comprehensive and systematic

approach to derivatives related issues" and that SEC controls "lose their effectiveness when

applied to derivatives."  77 Fed. Reg. at 11,255.  Given the SEC's own assessment of its

effectiveness — or lack thereof — in regulating entities involved in derivatives markets, the

---

[25] The plaintiffs point out the following overlap between the CFTC-NFA regulatory authority and the SEC-FINRA regulatory authority: "[b]oth regimes require registration, reporting, and disclosure; both impose recordkeeping obligations; both require protection of investor assets; both impose statutory anti-fraud provisions; both impose advertising restrictions; and both require qualifications testing of the persons who sell investment company shares or commodity pool interests."  Pls.' Mem. at 23.

plaintiffs' complaint about redundant regulation appears based on a false premise about the SEC's capacity and interest in regulating for the CFTC's purposes.

Moreover, the SEC and CFTC have different regulatory authority and purposes.  *See Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 386 (1982) (explaining that the CEA provision giving the CFTC exclusive jurisdiction in commodity derivatives markets was intended "to separate the functions of the [CFTC] from those of the Securities and Exchange Commission"); *see also* Def.'s Reply at 7 (ICI testimony to Congress in 2009, regarding the SEC and CFTC, stating that "each agency is called upon to maintain the integrity of the markets within its jurisdiction" (quoting *Examining What Went Wrong in the Securities Markets, How We Can Prevent the Practices That Led to our Financial System Problems, and How to Protect Investors: Hearing Before the Comm. on Banking, Housing, and Urban Affairs*, 111th Cong. 1, S. Hrg. 111-58, at 98, App. A, Executive Summary (2009))).  As the CFTC noted in the Final Rule, in response to a public comment, "[w]hile the Commission and the SEC share many of the same regulatory objectives," the CFTC has a particular role "to foster open, competitive, and financially sound commodity and derivatives markets." 77 Fed. Reg. at 11,278.[26]  Thus, the plaintiffs' assertion that the CFTC failed to "identify the baseline of benefits already provided under the status quo" is simply incorrect. Pls.' Mem. at 23.  The CFTC *did* identify the status quo — and disagrees with the plaintiffs, and other commenters who voiced the same view, that the SEC's regulation of these markets, alone, is sufficient.

This case is therefore distinguishable from *American Equity*, where the D.C. Circuit vacated an SEC rule because the agency "failed to analyze the efficiency of the existing state law

---

[26] While the plaintiffs emphasize the CFTC's statement that it shares with the SEC "many of the same regulatory objectives," *see* Pls.' Mem. at 15 (quoting 77 Fed. Reg. at 11,278), the CFTC counters that the plaintiffs take this statement out of its proper context, which is that the "CFTC was emphasizing the uniqueness of its own mission, distinct from the SEC." Defs.' Mem. at 28.

regime." *American Equity*, 613 F.3d at 179.  There, the Court found the agency's analysis

"incomplete because it fails to determine whether, under the existing regime, sufficient

protections existed to enable investors to make informed investment decisions and sellers to

make suitable recommendations to investors."  *Id*.   In contrast, the CFTC in this case *did* address

the SEC's role in regulating derivatives and still determined that the CFTC had a role to play.

For that same reason, this case is also distinguishable from *Business Roundtable*, where

the D.C. Circuit vacated an SEC rule because the SEC "failed adequately to address whether the

regulatory requirements of the ICA reduce the need for, and hence the benefit to be had from"

the agency's rule.  647 F.3d at 1154.  The CFTC in this case considered and evaluated the SEC's

regulatory objectives and determined that the CFTC should still require entities to register with

the CFTC because it is the CFTC's congressionally mandated role "to foster open, competitive,

and financially sound commodity and derivatives markets" and, as such, its "programs are

structured and its resources deployed to meet the needs of the markets it regulates."  77 Fed. Reg.

at 11,278.

Furthermore, the mandate from Congress in Dodd-Frank to incorporate swaps into the

definition of CPO demonstrates the insufficiency of prior regulations.  *See id*. at 11,258 (noting

that Dodd-Frank "amended the statutory definition of the terms 'commodity pool operator' and

'commodity pool' to include those entities that trade swaps") (citing 7 U.S.C. § 1a(10); 1a(11)).

While certain activities of RICs are regulated by the SEC, not all swaps derivatives have been

regulated by the SEC.  Clearly, then, Congress thought that additional regulation from the CFTC

was necessary for swaps in particular.  *See, e.g.*, Joint Proposed Rule, Further Definition of

"Swap Dealer," "Security-Based Swap Dealer," "Major Swap Participant," "Major Security-

Based Swap Participant" and "Eligible Contract Participant," 77 Fed. Reg. 30,596 (May 23,

2012) (noting that Dodd-Frank "particularly provides that the CFTC will regulate 'swaps,' and that the SEC will regulate 'security-based swaps'"); AR 865 (Comment from U.S. Senate (Dianne Feinstein, Carl Levin) (Nov. 30, 2011)) (noting that the SEC "does not have the equivalent expertise or experience in overseeing commodity related sales and trading practices"). It is therefore within the CFTC's purview to enact rules to appropriately pursue Congress' directive, including by using its discretion to foreclose an earlier blanket exception from CFTC regulation. *See Charter Communs., Inc. v. FCC*, 460 F.3d 31, 42 (D.C. Cir. 2006) (concluding that "[g]iven the Congressional command . . . and the FCC's determination . . . we cannot regard the agency's cost-benefit balance as arbitrary"). Accordingly, the plaintiffs' arguments that the CFTC did not assess the potential redundancy of their regulations of RICs are unavailing.

Finally, the plaintiffs express concern about the lack of harmonization between the CFTC and SEC regulatory regimes with respect to investment companies. While the plaintiffs contend that the CFTC "failed to determine the extent of those conflicts," Pls.' Mem. at 23, on the contrary, the CFTC explicitly recognized in the Final Rule that "there are certain provisions of its compliance regime that conflict with that of the SEC and that it would not be possible to comply with both." 77 Fed. Reg. at 11,272. Thus, concurrently with issuing the Final Rule, the CFTC issued a notice of proposed rulemaking "regarding the areas of potential harmonization between the Commission's compliance obligations and those of the SEC." *Id.*

The plaintiffs argue that this "regulate-first and harmonize-later approach" means that investment companies and their advisers will be subject to conflicting regulations.[27] Pls.' Mem.

---

[27] The plaintiffs lament, for example, that "dual regulation" "may confuse investors" by requiring RICs to disclose "similar information at different times, in different formats, and to different agencies," Pls.' Mem. at 14 (citing AR 452, Janus Capital Comment, at 2), and suggest that this could lead to companies "curtail[ing] their operations in the commodity markets, leading to 'market disruption, less liquidity for remaining market participants and harm to mutual funds' shareholders,'" *id.* (citing AR 641, Dechert Comment, at 13). The CFTC has responded that these disclosure requirements are "contingent on future rulemaking," namely the harmonization rulemaking, which could resolve the plaintiffs' concerns. Def.'s Mem. at 48.

at 37; *see also* Proposed Rule, Harmonization of Compliance Obligations for Registered

Investment Companies Required to Register as Commodity Pool Operators, 77 Fed. Reg. 11,345,

11,352 (Feb. 24, 2012) (Commissioner Sommers noting in her dissent that "[t]he proposed rules,

if finalized in their current form, would not achieve true harmonization.").  The CFTC, however,

contrary to the plaintiffs' assertions, acknowledged the potential overlap in regulatory regimes

and took steps to explore possible harmonization of the regimes.  Indeed, the CFTC suspended

compliance with the reporting obligations in Part 4 of its regulations for RICs until after the

release of the final harmonization rule.  *See* 77 Fed Reg. at 11,259 ("The Commission will not

require entities that must register due to the amendments to § 4.5 to comply with the

Commission's compliance regime until the adoption of final rules governing the compliance

framework for registered investment companies subject to the Commission's jurisdiction").

Specifically, while RICs are required to register with the CFTC pursuant to Section 4.5 as of

December 31, 2012, RICs will not have to comply with recordkeeping, reporting, and disclosure

requirements of the Final Rule, including the Section 4.27 reporting requirement, until 60 days

following the effectiveness of a final harmonization rule.  *See* 77 Fed. Reg. at 11,252

("Compliance with § 4.5 for registration purposes only shall be required not later than the later of

December 31, 2012, or 60 days after the effective date of the final rulemaking further defining

the term "swap," and "[e]ntities required to register due to the amendments to § 4.5 shall be

subject to the Commission's recordkeeping, reporting, and disclosure requirements pursuant to

part 4 of the Commission's regulations within 60 days following the effectiveness of a final rule

implementing the Commission's proposed harmonization effort pursuant to the concurrent

proposed rulemaking"); Def.'s Reply to Pls.' Supp. Resp., ECF No. 40 at 3 (agreeing with the

plaintiffs that, by the clear language of the Final Rule, "investment companies required to

register with the Commission pursuant to the amendments to Rule 4.5 need not comply with Rule 4.27 until after the harmonization rule becomes effective").

The Court agrees with the defendant that there was nothing arbitrary and capricious about the agency's decision to proceed with regulatory amendments, while assessing possibilities for harmonization of reporting requirements with another agency. Rather, the agency adopted a measured approach to extend the CPO regulatory regime in orderly phases, and in a manner that minimizes reporting burdens on regulated entities. The Court acknowledges that in a perfect world, all the pieces would come together at the same time and that this would be preferred. Yet, where significant benefits are at stake, the CFTC may take incremental, remedial steps to further its mission and fulfill congressional mandates, and address the related issues in an orderly manner. The agency's decision to proceed with certain aspects of the Final Rule, while completing the harmonization process, was not arbitrary and capricious.

   d)  *The CFTC Was Justified in Retaining an Exemption in the CPO Definition for Non-RIC Entities.*

The Court now turns to the plaintiffs' complaint that the CFTC targeted RICs for registration, with its attendant obligations, while retaining the exemption in the CPO definition for other entities in Section 4.5. Specifically, the plaintiffs point out that while the CFTC justified the Final Rule in part on the ground that "entities that are offering services substantially identical to those of a registered CPO should be subject to substantially identical regulatory obligations," Pls.' Mem. at 12 (quoting 77 Fed. Reg. at 11,255), commenters noted that the Rule "would create new asymmetries," where RICs meeting the registration thresholds would be required to register with the CFTC while other "otherwise regulated" entities would still be exempt from registration, *see id*. The CFTC explained in the Final Rule in response to a comment, however, that:

> The Commission is focused on registered investment companies because it is aware of increased trading activity in the derivatives area by such entities that may not be appropriately addressed in the existing regulatory protections, including risk management and recordkeeping and reporting requirements . . . . [It] is unaware of other classes of entities that are excluded from the definition of CPO engaging in significant derivatives trading.

77 Fed. Reg. 11,255.  In other words, the CFTC justified its distinction because it was aware of derivatives trading by RICs, but not by the other exempted entities, so determined that the RIC exemption should be eliminated while others remained in place.  In the Final Rule, the CFTC also stated it had relied, not only on the NFA Petition but on "comments received at the Roundtable and during the comment period," in concluding that RICs, in particular, were using "controlled foreign corporations as a mechanism to invest up to 25 percent" of the RICs' portfolio in derivatives.  *Id*. at 11,259.

Significantly, the plaintiffs nowhere assert that the CFTC was wrong in its assessment or offer evidence that other exempted entities are also engaged in "increased trading activity in the derivatives area."  As amicus, the National Futures Association points out that "certain registered investment companies took full advantage of the CFTC's 2003 amendments to Regulation 4.5 and began to extensively — and in some cases exclusively — use derivatives in their investment strategies, and directly market these investment companies to retail investors as commodity investments with minimum investments as low as $2,500."  Brief for NFA as Amici Curiae Supporting Defendant CFTC, ECF No. 24 at 11.  These RICs were "*de facto* commodity pools that [fell] entirely outside the CFTC's and NFA's customer protection regulatory regime for commodity pool operators."  *Id*.  Consequently, the NFA "argued to the CFTC that one of the key premises for the CFTC's 2003 amendments to Rule 4.5 —  that registered investment companies were 'otherwise regulated' regarding their derivatives trading — is no longer true." *Id*. at 8.  The NFA's petition is cited in the CFTC's Notice of Proposed Rulemaking, *see* 77 Fed.

Reg. at 7984, and helps further explain the CFTC's justification in issuing the amended Rule

particularly focused on rescinding the blanket exemption for RICs.[28]

### 2.    *Costs-Side Analysis*

The Court now turns to the plaintiffs' arguments about the insufficiency of the evaluation

of the costs of the Final Rule.  Specifically, the plaintiffs argue that the Final Rule imposes

"[s]ignificant [a]nd [u]nnecessary costs" and was issued in a manner "[m]aking [i]t [i]mpossible

[t]o [f]ully [d]etermine [t]hose [c]osts [a]s [r]equired [b]y [l]aw."  Pls.' Mem. at 34.[29]  Notably,

the plaintiffs do not say the Final Rule ignores costs altogether.  Indeed, the Final Rule outlines

anticipated costs of the registration and reporting requirements under Sections 4.5 and 4.27.[30]

With respect to Section 4.5, the CFTC estimated, for example, that "each CPO . . . not previously

subject to registration will be obligated to submit a $ 200 registration fee, an $ 85 registration fee

for each associated person, and a $ 15 fee for fingerprinting services for each associated person."

77 Fed Reg. at 11,273.  In addition, the CPO would be subject to, *inter alia*, $ 750 in annual

---

[28] Material cited in an agency's notice of proposed rulemaking may be used to properly justify agency action, but those documents added after the fact may not be used as justification.  *See Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008) (explaining that agencies must make public all "technical studies and data" on which it has relied in decision-making so that public can understand basis for agency action) (citation omitted); *Nat'l Ass'n of Reg. Util. Comm'rs v. FCC*, 737 F.2d 1095, 1121 (D.C. Cir. 1984) ("Disclosure of staff reports allows the parties to focus on the information relied on by the agency and to point out where that information is erroneous or where the agency may be drawing improper conclusions from it.").  The Court, however, "generally may not uphold agency action on a basis other than that relied upon by the agency."  *Manin v. Nat'l Transp. Safety Bd.*, 627 F.3d 1239, 1245 (D.C. Cir. 2011); *Coburn v. McHugh*, 679 F.3d 924, 934 (D.C. Cir. 2012).

[29] The plaintiffs suggest that the burdens that may arise from the amendment to Section 4.5 "include compliance costs for investment companies and their advisers, such as to reconcile and satisfy disparate regulatory requirements; upgrade systems to produce additional reports; hire additional compliance personnel; satisfy additional registration requirements; prepare and distribute required disclosure documents; and establish controls necessary to monitor and assure compliance with trading restrictions."  Pls.' Mem. at 34-35.  The plaintiffs further note that "[e]ven investment companies that may not trigger the registration thresholds will be required to expend significant time and resources monitoring compliance with the regulations, lest their trading or marketing activities trigger registration."  *Id.* at 35.

[30] As the defendant emphasized at the motions hearing, the CFTC "in this rulemaking, independently evaluated the costs and benefits of registration, standing alone, and reporting to the Commission on form CPO-PQR, standing alone, and then analyzed those costs together.  And that's — those are the costs of this action."  Tr. at 53, lines 5-11; *see also* 77 Fed. Reg. at 11,273, 11,275, 11,277.

membership dues for NFA membership, as well as NFA audit fees, which "var[y] greatly by individual entity and individual audit and thus [are] difficult to quantify on any sort of aggregate basis." *Id*. at 11,277.  Furthermore, the CFTC estimated the average annual time that would be required to submit the applicable registration forms.  *See id*. 11,272-73; *see also* Def.'s Mem. at 55.  The CFTC also recognized that CPOs newly required to register could also incur a variety of other costs, which would vary amongst CPOs, including for compliance personnel, development of information technology, and legal/accounting advice.  *See* 77 Fed. Reg. at 11,277.  With respect to requirements under Section 4.27, the CFTC provided estimates of the "[a]nnual reporting burden" for the completion of each of the three schedules of Form CPO-PQR.  77 Fed. Reg. at 11,275.

Notwithstanding these costs and time estimates contained in the Final Rule, the plaintiffs contend that the CFTC's costs-side analysis fell short, or was non-existent, primarily in three respects.  First, the plaintiffs argue that the CFTC was unable to evaluate the costs of the rule because the analysis of the overlap between the regulatory regimes of the CFTC-NRA and the SEC-FINRA has not yet been undertaken.  *See* Pls.' Mem. at 37-39.  Second, the plaintiffs argue that the CFTC was unable to assess the costs of including swaps in the threshold calculations because "swap" was not defined at the time of the rulemaking.  *See id*. at 36.  Both of these arguments find fault with the agency's decision to proceed with the Final Rule even though certain issues were not yet final.  Third, the plaintiffs make a broader argument throughout their briefing that suggests that these additional regulations are just too burdensome for already-highly regulated industries.  *See, e.g., id*. at 2 (emphasizing that investment companies are among the "most regulated types of companies in the United States"); *id*. at 23 (arguing that "[t]hese

collective burdens cannot be justified to eliminate informational blind spots"). The Court addresses each of these arguments in turn.

a)      *Harmonization with the SEC*

First, the Court turns to the plaintiffs' argument that the CFTC was unable to evaluate the costs of the Rule because of the still pending harmonization effort. The plaintiffs describe, the compliance obligations "that flow from registration . . . includ[ing], among other things, recordkeeping obligations, restrictions on segregation of assets, investor disclosures, marketing restrictions, [and] a requirement to register with the NFA." Pls.' Resp. at 23. According to the plaintiffs, many of these disclosures and filings under rules administered by the CFTC would overlap with disclosures and filings required by the SEC. *See id*. In a related point, the plaintiffs argue that the CFTC was unable to evaluate the "paperwork" burdens imposed by the Rule as required by the Paperwork Reduction Act. *See* Pls.' Mem. at 38 (citing 44 U.S.C. § 3507, H.R. Rep. No. 104-37, at 5 (1995)).

The defendant responds that the plaintiffs' complaints about the costs of post-registration compliance are "premature." Def.'s Mem. at 20. In fact, the CFTC points out that the plaintiffs "ignore that the Final Rule *exempts* RICs affected by the Rule 4.5 amendments from compliance with other CFTC Part 4 regulations pending a final harmonization rule." Def.'s Reply at 18 (emphasis in original);[31] *see also* 77 Fed. Reg. at 11,252 ("Entities required to register due to the amendments to § 4.5 shall be subject to the Commission's recordkeeping, reporting, and disclosure requirements pursuant to part 4 of the Commission's regulations within 60 days following the effectiveness of a final rule implementing the Commission's proposed harmonization effort pursuant to the concurrent proposed rulemaking"). The CFTC explains that

---

[31] The CFTC also notes in the Final Rule that it "is excluding § 4.5 compliance from the PRA burden calculation for these final rules, and is recalculating the information collection requirements associated with § 4.5 in the proposed harmonized compliance rules." 77 Fed. Reg. at 11,272.

it will consider "[t]he costs and benefits of other rules . . . if and when the Commission considers imposing them."  Def.'s Reply at 18; *see also* Def.'s Mem. at 56 (noting that the CFTC "will present its consideration under Section 15(a) for those areas when it issues a final harmonization rule.").

Since it has suspended any obligation to comply with the requirements that flow from registration under Section 4.5, the CFTC argues that the "[p]laintiffs' challenges to . . . compliance obligations, such as recordkeeping and disclosure, should be dismissed because they are unripe."  Def.'s Mem. at 20.  The CFTC emphasizes that it "separated those [compliance] issues specifically so that such costs would *not* follow inexorably from registration."  *Id*. at 56 (emphasis in original).  As noted, although the defendant has also postponed compliance with Section 4.27, the defendant considers that regulation final and not subject to change in the pending harmonization rulemaking.  The defendant thus argues that "the provisions challenged by [the p]laintiffs are final only with respect to registration under Rule 4.5 and financial reporting under Rule 4.27" and "not final as to other areas."  Def.'s Mem. at 16-17.

 The ripeness doctrine is intended to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  *Astrazeneca Pharms. LP v. FDA*, 850 F. Supp. 2d 230, 241 (D.D.C. 2012) (citation omitted).  "In determining whether administrative action is ripe for review, the district court must begin with a presumption of reviewability and then evaluate the fitness of the issues for judicial decision and the hardship to the parties of withholding the court['s] consideration."  *Id*. at 242 (citation and internal quotation marks omitted); *see also Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 735 (1998)

(noting that "[t]he ripeness doctrine reflects a judgment that the disadvantages of a premature review that may prove too abstract or unnecessary ordinarily outweigh the additional costs of — even repetitive — post-implementation litigation").

The Court agrees with the defendant that the compliance obligations challenged by the plaintiffs are not yet fit for review for three reasons.  First, it is unclear at this stage what compliance obligations, if any, will flow from Section 4.5 registration for RICs that no longer qualify for an exception under Section 4.5, and the extent to which those compliance obligations will entail any additional disclosures to either or both the SEC and CFTC.  Second, the CFTC admits that it has not yet undertaken an analysis of the costs and benefits related to harmonizing compliance obligations, nor undertaken an analysis under the Paperwork Reduction Act, and that it has suspended the plaintiffs' obligations to comply with compliance regulations until after the harmonization process.  Thus, there is simply no basis on which the Court can properly evaluate the plaintiffs' concerns about the CFTC's promulgation of what are now hypothetical compliance obligations.  Finally, the plaintiffs will not suffer any hardship because, as the CFTC represents, "the relevant compliance dates are contingent on enactment of a final harmonization rule and provide additional time for CPO/RICs to comply."  Def.'s Mem. at 50.

The Court appreciates the plaintiffs point that, upon completion of the harmonization process when compliance with recordkeeping, reporting and disclosure requirements of part 4 is required, those RICs that no longer qualify for a Section 4.5 exemption may carry a heavier regulatory compliance burden.  While these compliance obligations are indisputably related to, and "flow from," the registration requirement under Section 4.5, the Court nonetheless finds that such compliance is separate from and peripheral to the registration requirement — and distinct from the discrete data collection requirements in Section 4.27 — and therefore not so integral to

the consideration of the costs of the amendments to Sections 4.5 and 4.27 that consideration is necessary now.[32]

Accordingly, the Court will grant the defendant's motion to dismiss the plaintiffs' claims regarding compliance obligations that "flow from registration."  While the plaintiffs are skeptical of rulemaking proceeding in stages, the Court recognizes that is simply the reality in some cases. The time for any challenge to any new compliance obligations is when the final harmonization rule has been released and the nature of those obligations is clear.  At this stage, however, the only challenges ripe for review are the plaintiffs' challenges to Section 4.5 and Section 4.27.

### b)   *Inclusion of Swaps in Trading Threshold*

The plaintiffs also argue that the CFTC made it impossible to assess the costs of the Final Rule because it included swaps within the trading threshold when the "key regulations regarding swaps — including the very definition of the term — have yet to be finalized."  Pls.' Mem. at 45. The Court disagrees — and notes that the Swaps Final Rule has since become finalized.  *See* Joint Final Swaps Rule, Further Definition of "Swap," "Security-Based Swap Dealer," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48,208 (Aug. 13, 2012).

Dodd-Frank provided a detailed definition of "swap," *see* Dodd-Frank § 721(a),124 Stat. at 1666-68 (to be codified at 7 U.S.C. § 1a(47)), but directed the CFTC and SEC to jointly issue rules further defining the term and other related terms, *see* Dodd-Frank § 712(d)(1), 124 Stat. at

---

[32] The plaintiffs cite to public comments of the CFTC Chairman, wherein he noted that the CFTC "ought to be able to take the forms from the [SEC]."  Pls.' Mem. at 14 (citing Webcast: Sixth Annual Capital Markets Summit (Mar. 28, 2012) (pt. 2 at 25:18) (Statement of Comm'r Gensler), *available at* http://www.uschamber.com/webcasts/6th-annual-capital-markets-summit ("Capital Markets Webcast").  "[T]hat is not how the Rule functions at all," the plaintiffs retort.  Pls.' Mem. at 14.  Immediately preceding the comment the plaintiffs' excerpt, however, the Chairman mentioned the agency's harmonization process with the SEC, in which the agencies are attempting to harmonize their regulatory requirements.  *See id.*  The result of that process could be that the CFTC "take[s] forms from the SEC," but this Court will not prejudge that rulemaking.  Likewise, this Court sees no reason to vacate Sections 4.5 and 4.27 because the CFTC's discretionary harmonization process with the SEC is not yet complete.

1644.  The CFTC determined that the Dodd-Frank definition of "swap" is comprehensive, however, and that "extensive 'further definition' of the term[ ] by rule is not necessary."  Joint Proposed Swap Rule, 76 Fed. Reg. 29,818, 29,821 (May 23, 2011).  Thus, according to the CFTC, the "agencies . . . proposed [in their swap rulemaking] only limited clarifications to narrow the definition by *excluding* 'certain types of agreements, contracts, and transactions, such as insurance products and certain consumer and commercial contracts,' and to provide interpretative guidance."  Def.'s Mem. at 61 (quoting 76 Fed. Reg. at 29,281) (emphasis in original); *see also* Final Joint Swaps Rule, 77 Fed. Reg. at 48,211 (noting that while the "Commissions believe that extensive 'further definition' of the terms by rule is not necessary," the Commissions believe that some clarification of the definition was in order).  In short, the Final Rule relies on the statutory definition of swaps in Dodd-Frank, and doing so was appropriate when the expert agency viewed it as complete.  Since the CFTC and SEC's final swap rulemaking only sought to clarify in a limited way the existing statutory definition in Dodd-Frank, it was not arbitrary and capricious for the CFTC to issue the Final Rule prior to the finalization of the swaps definition in the Final Rule on Swaps.

### c)      The "Burdens" of the Final Rule

The plaintiffs make a broader argument throughout their briefing that the regulatory requirements of the Final Rule are just too burdensome.  The plaintiffs reiterate that RICs are "among the most comprehensively regulated entities in the U.S. financial system," and observe that even the CFTC "admitted in its final rule release that subjecting investment companies to additional regulation would impose 'significant burdens.'"  Pls.' Mem. at 1.  These concerns about additional regulatory burden are insufficient to compel enjoining a regulatory action targeted to obtain information considered vital to the protection of the financial markets.

The Supreme Court has consistently explained that "[w]e must reverse an agency policy when we cannot discern a reason for it." *Judulang v. Holder*, 132 S. Ct. 476, 490 (2011). Here, as the Court has explained, the amendments to Section 4.5 and 4.27 were adopted after the CFTC considered the financial crisis, the congressional intent and mandate in Dodd-Frank, and the evidence that investment companies were engaging in potentially risky and non-transparent practices. In light of all of these considerations, the CFTC reasoned that it was necessary to return to its pre-2003 regulation requiring RICs engaging in more than a *de minimis* amount of derivatives trading to register as CPOs. *See* 77 Fed. Reg. at 11,278.

Set against the considerations outlined in the Final Rule, that these registration and data reporting requirements are *burdens* on the plaintiffs is not reason to find that the agency acted in a manner that was arbitrary and capricious. Moreover, the Court is not persuaded that Section 4.5 and 4.27 regulation will be *unduly* burdensome. Section 4.5, by narrowing an exemption, expands a regulatory regime already applicable to registered CPOs to entities engaged in the same regulated activity. Registered CPOs already comply with this regime so it is truly an uphill battle for the RICs to demonstrate that such regulation would be unduly burdensome for them. *See* 77 Fed. Reg. at 11,278 (Despite recognizing that "significant burdens may arise from the modifications to § 4.5, the CFTC believes "entities that are offering services substantially identical to those of a registered CPO should be subject to substantially identical regulatory obligations."). As the CFTC observed in the Final Rule: "the compliance and regulatory obligations imposed on these CPO registrants will be no different from those imposed on other registered CPOs. Such compliance and regulatory obligations have not been unduly burdensome for these other registrants." *Id*. at 11,262.

RICs are after all, as the plaintiffs emphasize repeatedly, subject "to myriad regulations covering virtually every aspect of investment companies' business." Pls.' Mem. at 4. Indeed, by virtue of being RICs, these entities already have systems in place to deal with the compliance obligations of regulation. The CFTC recognized in the Final Rule that while the entities will incur new costs as they comply with new CFTC regulations, these burdens are relatively minor for entities that are already heavily-regulated. Specifically, the CFTC recounts that one commenter, in arguing against a rescission of another exemption not at issue here, suggested that "any fund that seeks to attract qualified eligible purchasers is already required to maintain oversight and controls that exceed those mandated by part 4 of the Commission's regulations." 77 Fed. Reg. at 11,264. The commenter further noted that, "[w]e are accustomed to intense scrutiny from potential investors. . . . To say that such information-gathering goes far beyond the contents of a mandated disclosure document is a gross understatement." *Id*. at 11,264-65. The CFTC indicated, contrary to "the commenter's arguments as to the import" of its description of the significant level of controls already in place "independent of regulation," that "such controls and internal oversight should facilitate compliance with the Commission's regulatory regime." *Id*. at 11,265. The Court agrees. In evaluating the relative burden of the CFTC's CPO regulatory regime, it is appropriate to consider the fact that RICs, by virtue of the regulated environment in which they operate, already have robust internal compliance mechanisms in place.

Similarly, with respect to the data collection requirements of Section 4.27, the CFTC pointed out that "obtain[ing] information from the full universe of registrants to fully assess the activities of CPOs and CTAs in the derivatives market," was "necessary" for the CFTC to "fulfill [its] systemic-risk mitigation mandate." 77 Fed. Reg. at 11,723. Thus, the CFTC intended to

collect from RICs that also registered as CPOs, "the same information that it is requiring from entities solely registered as CPOs." *Id*. at 11,266.  Indeed, the Final Rule indicates that currently registered CPOs have already been using "for more than one year" the forms required to be filed under new Section 4.27 (*e.g.*, Form CPO-PQR), which again provides real-life demonstration that compliance with this section should not be unduly burdensome. *Id*. at 11,268.

The Supreme Court recently explained that "[c]ost is an important factor for agencies to consider in many contexts." *Judulang*, 132 S. Ct. at 490.  Support for the agency policy at issue in that case was urged by the government on grounds that the policy "saves time and money." *Id*. at 489.  The Supreme Court rejected this rationale, stating that "cheapness alone cannot save an arbitrary agency policy," which is "unmoored from the purposes and concerns of the [relevant] laws." *Id*. at 490.  Conversely, if the Court concludes that an agency policy is not arbitrary or capricious, but is, as here, sufficiently justified by the agency based upon its evaluation of the relevant statute and context, the mere fact that it carries costs and burdens does not render it violative of the APA.

While the CFTC must consider and evaluate the costs of its rules pursuant to its obligations under the CEA, as *Judulang* makes clear, the CFTC is not required to promulgate only rules that have low or no costs; rather, the agency is simply required to show that they "*considered*" and "*evaluated*" the costs of the rule. *See* 7 U.S.C. § 19(a).  Therefore, the suggestion that the Court should find an agency's actions arbitrary and capricious because regulations carry costs is unavailing.  Furthermore, the plaintiffs' emphasis on the costs and burdens of the Final Rule obscures the overall purposes and benefits of the rule.  Where the Final Rule is "moored" to the "purposes and concerns" of Dodd-Frank, *id*. at 490, and well within the agency's discretion, and where the agency determines that the costs of the Final Rule are

outweighed by its benefits, this Court finds no reason for finding that the agency acted in a manner that was arbitrary and capricious.

**B.      There Is No Basis to Disturb "Significant Aspects" of the Rule, as the Plaintiffs Request.**

The Court now turns to the plaintiffs' arguments that the CFTC failed to provide reasoned justification for (1) "impos[ing] new filing obligations on investment companies and advisers without considering whether those obligations were necessary" in the form of amendments to Section 4.27; (2) including "swaps within the registration thresholds;" (3) providing a "restrictive definition of bona fide hedging;" and (4) "set[ting] the non-bona-fide hedging trading threshold at five percent."  Pls.' Mem. at 39.  The Court addresses each of these issues in turn.

First, the plaintiffs argue that "[a]t the same time that it narrowed the Section 4.5 exclusion for investment companies, the Commission arbitrarily and capriciously multiplied the regulatory burden imposed on *all* registered CPOs by adopting new Section 4.27, which will require CPOs to file a report called Form CPO-PQR."  *Id.* (citing 77 Fed. Reg. at 11,285-86, 11,295-96).  They claim that the CFTC "nowhere determined what information already was disclosed, and nowhere compared the content of those disclosures to Form CPO-PQR."  *Id.* at 40.  Furthermore, the plaintiffs argue that the CFTC did not explain why its reason for requiring Form CPO-PQR "applies to investment companies *at all*."  Pls.' Resp. at 43.  The plaintiffs do not dispute that the CFTC has authority to require RICs to complete Form CPO-PQR but instead question the justification for such a requirement.  The CFTC responds that "it is important to collect the data in Form CPO-PQR from [RICs] whose activities require CPO registration to assess the risk posed by such investment vehicles to derivatives markets and the broader financial system."  77 Fed. Reg. at 11,266.

Just as the Court concludes that the CFTC was justified in amending Section 4.5, the Court finds that the CFTC is also justified in seeking information from RICs pursuant to Section 4.27 that will be helpful in bringing light to the "blind spots" in the financial markets that are subject to the CFTC's regulations.  Indeed, "to the extent that factual determinations were involved in the [agency's] decision" here, the Court believes that they "were primarily of a judgmental or predictive nature." *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 813 (1978).  That is, the decision to require data collection was not curative because the financial crisis which sparked the increased desire for transparency is over, but the data collection via registration and reporting is intended to provide more transparency to avoid other problems in the future.  "In such circumstances complete factual support in the record for the Commission's judgment or prediction is not possible or required." *Id.* at 814; *see also Nat'l Ass'n of Mfrs. v. NLRB*, 846 F. Supp. 2d 34, 51 (D.D.C. 2012) (same); *Dist. Hosp. Ptnrs., L.P. v. Sebelius*, 794 F. Supp. 2d 162, 166 (D.D.C. 2011) (noting that the Court "has a 'limited' role and its review is 'particularly deferential' where the agency's decision is 'primarily predictive'. . . . Thus, the Court 'require[s] only that the agency acknowledge factual uncertainties and identify the considerations it found persuasive.'") (quoting *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009)).  Moreover, the plaintiff has not identified for the Court any reason to disturb the requirements set forth in Section 4.27 as applied to RICs.  Accordingly, the Court finds that the CFTC did justify this amendment and therefore that such action was not arbitrary and capricious.

Second, in a related but different argument than the criticism about the inclusion of swaps in the trading threshold before the definition was final, the plaintiffs argue that the CFTC's reasoning for its decision to include swaps within the registration thresholds at all was "illogical

and inadequate." Pls.' Mem. at 40. The plaintiffs point out that commenters on the Final Rule noted that the inclusion of swaps in the calculation of registration thresholds was "unnecessary and premature." *Id.* The CFTC argues, to the contrary, that the decision to include swaps "follows logically, if not inexorably, from Dodd-Frank," which gave the CFTC jurisdiction over the swaps market, and that "it would have been anomalous in the extreme for the Commission to ignore an entity's swaps trading in determining whether to exercise oversight." Def.'s Mem. at 19. Indeed, Congress specifically expanded the statutory definition of a CPO to include swaps. In the face of express congressional intent for the CFTC to exert regulatory authority over swaps trading, the CFTC would have ignored a significant purpose of Dodd-Frank and defied Congress by failing to expand the CPO definition to cover entities trading swaps, or, in this case, failing to rescind outdated exclusions that were inconsistent with that congressional purpose.

Moreover, in the Final Rule, the CFTC responded to comments seeking clarifications regarding its decision to include swaps within the threshold and stated that "[t]he Dodd-Frank Act amended the statutory definition of the terms 'commodity pool operator' and 'commodity pool' to include those entities that trade swaps." 77 Fed. Reg. at 11,258. The Final Rule noted that "[a]s a result, one swap contract would be enough to trigger the registration requirement." *Id.* Since the CFTC had concluded, however, that "de minimis activity by [RICs] does not implicate the Commission's regulatory concerns," *id.*, to require registration of an investment company with trading activity below the threshold only because it has a small amount of swaps "would . . . not grant the regulatory relief commenters were seeking," Def.'s Mem. at 35. Therefore, "[i]f the Commission were to adopt the trading threshold and only include futures and options as the basis for calculating compliance with the threshold, the swaps activities of the [RICs] would still trigger the registration requirement notwithstanding the exclusion of swaps

from the calculus." 77 Fed. Reg. at 11,258.  In other words, the CFTC included swaps within the

*de minimis* trading threshold because to do otherwise would mean that those entities trading

swaps would not be able to benefit from the *de minimis* trading threshold.

The plaintiffs argue that this reasoning misreads Section 4.5, "which requires registration

only if an investment company triggers the trading or marketing thresholds, so that excluding

swaps from the thresholds would result in the exclusion of more entities, not fewer."  Pls.' Mem.

at 41.  The plaintiffs suggest that an alternative would have been for the CFTC to "exclude swaps

from the determination of whether an investment company met the definition of a CPO."  *Id.*

The CFTC's goal was not, however, to exclude "more entities" but to exclude only entities

engaged in *de minimis* trading activity that would otherwise qualify them as CPOs.  The CFTC

explains that "the point is a limited, technical reminder . . . that the CFTC's threshold test carves

out entities that otherwise fall within the statutory definition of a CPO," Def.'s Mem. at 35,

which, after Dodd-Frank, includes swaps.  The Court agrees.  Therefore, the Court finds that the

decision to include swaps in the threshold was not arbitrary and capricious.

Next, the Court turns to the plaintiffs' third argument that the CFTC arbitrarily adopted a

narrow definition of bona fide hedging by defining the term with reference to 17 C.F.R. §§

1.3(z)(1) and 151.5, with the effect of "limit[ing] the definition of bona fide hedging to

transactions designed to offset exposure in the physical commodity markets only" while

commenters "urged a broader definition of bona fide hedging."  Pls.' Mem. at 42.  The plaintiffs

contend that the "Commission did not explain why it was excluding other risk mitigation

strategies that are *also* offset by exposure in another market."  *Id.* at 42-43 (emphasis in original).

The CFTC responds that it had "no obligation to offer *any* such exception," and, furthermore,

expressed concern that the "risk management" exception suggested by the plaintiffs "would be

difficult to cabin because objective criteria for marking the boundaries of such an exception are lacking." Def.'s Mem. at 19 (emphasis in original). On this issue regarding bona fide hedging, the plaintiffs have offered no reason for the Court to disturb the CFTC's decision to offer such an exception.

The plaintiffs' concerns about the definition of bona fide hedging were exacerbated after the briefing was complete on the pending motions due to a recent case in this Circuit, in which another district judge addressed an issue of statutory interpretation regarding whether the CFTC was required, in establishing the so-called Position Limits Rule, to make a determination whether such limits are necessary and effective. Judge Wilkins determined that the CFTC misinterpreted its statutory authority under the CEA, as amended by Dodd-Frank, to mean that position limits could be imposed without regard to whether such limits were appropriate or necessary. He vacated the CFTC's position limits rulemaking, but did not indicate whether the amendments contained therein to Rule 1.3(z) or Rule 151.5 were flawed. *See International Swaps & Derivatives Ass'n ("ISDA") v. CFTC*, No. 11-cv-2146, 2012 WL 4466311 (D.D.C. Sept. 28, 2012). Following oral argument on the instant motions, the CFTC submitted supplemental briefing on the effect of the *ISDA* ruling on the amendment to Section 4.5 at issue in this lawsuit. The CFTC informed the Court that, in light of *ISDA*, on October 12, 2012, the Division of Swap Dealer and Intermediary Oversight, pursuant to its authority under 17 C.F.R. § 140.99, issued a "no action" letter explaining that it "interprets [Section 4.5] as continuing to incorporate the substance of amended Commission Regulation 1.3(z)(1) and Commission Regulation 151.5, for purposes of that provision." Def. CFTC's Statement in Resp. to the Court's Inquiry Concerning the Def. of "Bona Fide Hedging," ECF No. 36 at 4 (citing DSIO Release at 1-2). Thus, the CFTC assured the Court that *ISDA* "will not impact the operation of amended Rule 4.5." *Id.*

The plaintiffs argue that the CFTC's answer, which suggests that these provisions have not been vacated, "compounds the uncertainty created by the procedural irregularities that pervade this rulemaking, and demonstrates the pressing need for vacatur by this Court."  Pls.' Supp. Submission in Resp. to the Court's Inquiry Concerning the Def. of "Bona Fide Hedging," ECF No. 38 at 1.  The Court is sympathetic to plaintiffs' concerns about the definition of bona fide hedging.  Ultimately, though, the Court agrees with the CFTC that the Final Rule did not "assume the validity" of the position limits rule at issue in *ISDA*, but "merely incorporated the bona fide hedging language by reference."  Def.'s Reply to Pls.' Supp. Resp., ECF No. 40, at 1.  Thus, Section 4.5's reference to the "meaning and intent" of the Rules 1.3(z)(1) and 151.5, is still valid following *ISDA* under this Court's deferential arbitrary and capricious review.  A Court does "not reverse [an agency's decision] simply because there are uncertainties, analytic imperfections, or even mistakes in the pieces of the picture petitioners have chosen to bring to our attention, but only when there is such an absence of overall rational support as to warrant the description 'arbitrary and capricious.'"  *See, e.g.*, *Center for Auto Safety v. Peck*, 751 F.2d 1336, 1370 (D.C. Cir. 1985) (internal citation omitted).

Finally, the Court turns to the plaintiffs' fourth argument that the CFTC "failed to offer a reasoned explanation for its decision to set the non-bona fide hedging threshold at five percent" when there was "abundant evidence in the record that a five percent threshold was too low."  Pls.' Mem. at 43.  According to the plaintiffs, a five percent threshold "had come to limit the activities of investment companies 'to a much greater extent' than originally intended."  *Id*.  The record does not indicate that the five-percent threshold was too low, however.  To the contrary, when the NFA, which oversees all CPOs and CTAs registered with the CFTC, submitted its petition recommending that the CFTC return to pre-2003 regulation of RICs, *it suggested a five-*

*percent threshold.  See* AR 201.  The CFTC adopted the NFA's recommendation, stating in its

notice of proposed rulemaking that it was "proposing to amend § 4.5 to reinstate the pre-2003

operating criteria consistent with the language proposed by NFA in its petition."  76 Fed. Reg. at

7984.  In the Final Rule, the CFTC noted that "[f]ive percent remains the average required for

futures margins."  Def.'s Mem. at 32 (quoting Final Rule 77 Fed. Reg. at 11,256).  Thus, the

five-percent threshold "is a standard the Commission applied for nearly twenty years before the

2003 deregulation" and that the CFTC continues to consider to be appropriate.  Def.'s Mem. at

18, 32-33.

    While an agency "may not pluck a number out of thin air," the Court recognizes that "a

line has to be drawn" and so the agency's threshold will be upheld unless it is "patently

unreasonable" or "a dictate of unbridled whim."  *Vonage Holdings Corp. v. FCC*, 489 F.3d 1232,

1242 (D.C. Cir. 2007) (quoting *WJG Tel. Co. v. FCC*, 675 F.2d 386, 388-89 (D.C. Cir. 1982)).

While some commenters had argued that the five-percent threshold was too strict, the CFTC

noted in the Final Rule that the commenters provided no "data . . . to support this assertion."

Def.'s Mem. at 32.  Thus, there was nothing to contradict the CFTC's reasoning that five percent

remained the correct level for the trading threshold.  *See Chamber of Commerce v. SEC*, 412

F.3d 133, 143 (D.C. Cir. 2005) (quoting *Public Citizen v. Fed. Motor Carrier Safety Admin.*, 374

F.3d 1209, 1221 (D.C. Cir. 2004), for the proposition that, "in face of uncertainty, agency must

'exercise its expertise to make tough choices about which of the competing estimates is most

plausible, and to hazard a guess as to which is correct, even if . . . the estimate will be

imprecise'").  Without conflicting data at the time of the rulemaking, and with the well-reasoned

recommendation of the NFA, it was not arbitrary and capricious for the agency to maintain the

five percent threshold it had formally applied for nearly two decades before the 2003 deregulation.

The CFTC also notes that "to address concerns that the five percent threshold might be too restrictive in certain instances," it provided the alternative "net notional value" test.  Def.'s Mem. at 18.  This test provides relief "for entities whose portfolios only contain a limited amount of derivatives positions."  77 Fed. Reg. at 11,257-58.  The CFTC notes that "[b]ecause the Alternative Net Notional Test permits exclusion from the registration requirement regardless of the percentage of the liquidation value of the fund that is committed to initial margin and premium payments, the Alternative Net Notional Test can be less restrictive for some entities than the 5% threshold test and provide additional flexibility in determining eligibility for exclusion."  Def.'s Notice of Clarification Regarding the Alternative Net Notional Test and Submission of Citation, ECF No. 37 at 1-2 (quoting 77 Fed. Reg. at 11,257-58) (internal quotation marks omitted).  Providing such a reasoned alternative demonstrates the CFTC's consideration of the implications of its rulemaking.

Furthermore, looking more broadly to indicia of congressional intent, the Dodd-Frank Committee Report recognized that OTC derivatives can be used to manage risk and increase liquidity, as the plaintiffs point out, but also are used "to hide leverage," allowing traders to "take large speculative positions on a relatively small capital base because there are no regulatory requirements for margin or capital."  S. Rep. 111-176 at 30.  To address the "dangers of under-collateralization," *id*., the Committee expressed the view that "[m]ore collateral in the system, through margin requirements, will help protect taxpayers and the economy from bailing out companies' risky derivatives positions in the future."  *Id*. at 31.  Citing the "devastating consequences" in 2008 of the systemic risk presented by the unregulated OTC derivatives

market, *id*. at 32, the Committee Report called upon regulators to "impose capital requirements on swap dealers and major swap participants." *Id*. at 33.  The Committee emphasized that OTC market participants should "be subject to reporting, capital, and margin requirements so that regulators have the tools to monitor and discourage potentially risky activities, except in very narrow circumstances." *Id*. at 34.  The Committee further instructed regulatory agencies that "exceptions should be crafted very narrowly with an understanding that every company, regardless of the type of business they are engaged in, has a strong commercial incentive to evade regulatory requirements." *Id*.  Moreover, "[i]n providing exemptions, regulators should minimize making distinctions between the types of firms involved in the market or the types of products the firms are engaged in and instead evaluate the nature of the firm's derivatives activity." *Id*. at 35.  The Committee Report quotes positively the view of the CFTC Chairman Gensler that the regulatory regime should apply "'no matter which type of firm, method of trading or type of derivative or swap is involved.'" *Id*.  In other words, the Committee clearly expressed the policy preference articulated by the CFTC and NFA that "similar products and activities be subject to similar regulations and oversight," *id*, which only provides more support for the CFTC's narrow exclusions from the CPO definition, including a trading threshold at only 5 percent.

C.     **The CFTC Fulfilled Its Specific Obligations Under the CEA to Consider and Evaluate the Costs and Benefits of the Final Rule.**

While the Court has framed its discussion in terms of the plaintiffs' broad concerns about the CFTC's assessments of the "benefits" and "costs" of the Final Rule, the Court now turns to the plaintiffs' specific concerns that the CFTC did not fulfill its obligations under Section 15(a) of the CEA to consider and evaluate the costs and benefits of the Final Rule.

Under Section 15(a), "[b]efore promulgating a regulation under this Act [7 U.S.C. §§ 1 et seq.] or issuing an order (except as provided in paragraph (3)), the Commission shall consider the costs and benefits of the action of the Commission."  7 U.S.C. § 19(a)(1).  This section further provides that:

> The costs and benefits of the proposed Commission action shall be evaluated in light of—
> (A) considerations of protection of market participants and the public;
> (B) considerations of the efficiency, competitiveness, and financial integrity of futures markets;
> (C) considerations of price discovery;
> (D) considerations of sound risk management practices; and
> (E) other public interest considerations.

*Id*. at § 19(a)(2).

The plaintiffs contend that the CEA's requirements are similar to the SEC's obligation to "consider . . . whether [its rules] will promote efficiency, competition, and capital formation" and point to recent cases where the D.C. Circuit has invalidated SEC rules for failing to fulfill that requirement.  Pls.' Mem. at 21 (citing *Bus. Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011); *Am. Equity Life Ins. Co. v. SEC*, 613 F.3d 166 (D.C. Cir. 2010); *Chamber of Commerce v. SEC*, 412 F.3d 133 (D.C. Cir. 2005)).  The plaintiffs contend that, in fact, the CFTC's obligation under the CEA is *even more stringent* because while the SEC is directed to "consider" the costs and benefits, the CFTC must "consider" and "evaluate" the costs and benefits.  Pls.' Mem. at 21.

The Court analyzes the CFTC's responsibilities to consider the factors set forth in the CEA under the same deferential "arbitrary and capricious" standard that applies more broadly to the Court's review of the CFTC's rulemaking.  No Court has interpreted Section 15(a) of the CEA to require — and nothing in the text of the CEA calls for — a different standard of review.  Furthermore, the SEC cases on which the plaintiffs rely concerning the SEC's cost-benefit analysis responsibilities under the SEC's governing statute all employ this same familiar

deferential standard.  *See Bus. Roundtable v. SEC*, 647 F.3d at 1148 (employing "arbitrary and capricious" standard and emphasizing the SEC's "statutory obligation to determine as best it can the economic implications of the rule"); *see also id.* (noting the SEC's "unique obligation to consider the effect of a new rule upon 'efficiency, competition, and capital formation'" and that a "failure to apprise itself – and hence the public and the Congress – of the economic consequences of a proposed regulation makes promulgation of the rule arbitrary and capricious and not in accordance with law") (citations and internal quotation marks omitted); *Am. Equity Inv. Life Ins. Co.*, 613 F.3d at 177 (reviewing the merits of the petitioners' challenge to the SEC's analysis under the "statutory standard set by the Administrative Procedure Act"); *Chamber of Commerce*, 412 F.3d at 140 (applying "arbitrary and capricious" standard in reviewing petitioner's claim that the SEC "did not comply with its obligation under ICA to consider whether those conditions 'will promote efficiency, competition, and capital formation'") (citation omitted).

To the extent that the plaintiffs suggest that this Court needs to adopt a different and more stringent standard for reviewing the CFTC's consideration and evaluation of costs and benefits under Section 15(a) of the CEA, the Court disagrees.  There is no basis for employing anything but a deferential standard for reviewing the agency's compliance with its obligations under the CEA.  Applying that deferential standard, the Court finds nothing arbitrary or capricious about the CFTC's compliance with its responsibilities under the CEA.  Indeed, an examination of the Final Rule reveals that the CFTC considered and evaluated the costs and benefits of the proposed agency actions in light of the five factors outlined in Section 15(a) of the CEA.  The Court will discuss each of these factors *seriatim* below.

First, the CFTC considered and evaluated the costs and benefits of the Final Rule in light of "considerations of protection of market participants and the public."  7 U.S.C. § 19(a)(2)(A). With respect to the registration requirement in Section 4.5, the CFTC concluded that registration will provide numerous benefits for registrants and for the public, including: "protect[ing] market participants and the public by requiring certain parties previously excluded or exempt from registration to be held to the same standards as registered operators and advisors, which ensures the fitness of such market participants and professionals"; allowing "clients wishing to invest with registered entities [to] have the knowledge that such entities are held to a high financial standard through periodic account statements, disclosure of risk, audited financial statements, and other measures designed to provide transparency to investors;" and "furthering the goal of investor protection [by] . . . provid[ing] an on-line, public database with information on the registration status of market participants" in order "to assist the public in making investment decisions regarding the use of derivatives professionals."  77 Fed. Reg. at 11,280.  As for the costs, the CFTC "recognize[d] that significant burdens may arise from the modifications to § 4.5," *id*. at 11,278, and provided estimates of some aspects of those registration costs, as discussed *supra*.  Nevertheless, the CFTC concluded that it "believes the benefits of transparency in the derivatives markets in the long term will outweigh these costs, which should decrease over time as efficiencies develop."  *Id*. at 11,280.

The CFTC also considered the data collection requirement under Section 4.27, stating that it "believes that the information to be gathered . . . increases the amount and quality of information available regarding a previously opaque area of investment activity and, thereby, enhances the ability of the Commission to protect investors and oversee derivatives markets." *Id*. at 11,281.  The CFTC also considered the costs of data collection, noting that it had attempted

to "mitigate reporting costs" of those entities registered with both the CFTC and the SEC by allowing dually registered entities to file only form PF (as well as the first schedule A of form CPO-PQR) for all of their commodity pools.  *Id.*

Second, the CFTC considered and evaluated the costs and benefits of the agency action in light of "considerations of the efficiency, competitiveness, and financial integrity of futures markets."  7 U.S.C. § 19(a)(2)(B).  With respect to the registration requirement in Section 4.5, the CFTC considered that the amendments adopted in the Final Rule "will result in the registration of more CPOs and CTAs, which will enable the Commission to better oversee their activities in the derivatives markets, thereby protecting the integrity of the markets" and, noted, furthermore, that the CFTC "will be able to better understand who is operating in derivatives markets and identify any threats to the efficiency, competitiveness, or integrity of markets."  77 Fed. Reg. at 11,280.  The CFTC also believed that "because similarly situated entities in the derivatives markets will be subject to the same regulatory regime, the competitiveness of market participants will be enhanced."  *Id.*   As to the data collection amendments, the CFTC believed that these amendments do not "relate[] directly to the efficiency or competitiveness of futures markets" but viewed oversight of participants within derivatives markets as affecting "proper oversight of derivatives markets and the financial system as whole."  *Id.* at 11,281.  In short, the CFTC found that data collection requirements "protect the integrity of futures markets."  *Id.*

Third, the CFTC considered and evaluated the costs and benefits of the Final Rule in light of "considerations of price discovery," 7 U.S.C. § 19(a)(2)(C), concluding with respect to both the registration requirement in Section 4.5 and the data collection requirements, including in Section 4.27, that it was not able to "identif[y] any impact on price discovery through the

registration of additional CPOs and CTAs as a result of these regulations," 77 Fed. Reg. at

11,280, or "as a result of this data collection initiative," *id*. at 11,281.

Fourth, the CFTC considered and evaluated the costs and benefits of the Final Rule in

light of "considerations of sound risk management practices."  7 U.S.C. § 19(a)(2)(D).  With

respect to the registration requirement in Section 4.5, the CFTC stated the information it gathers

will, *inter alia*, allow the CFTC "to better understand the participants in the derivatives markets

and the interconnectedness of all market participants," which will allow the CFTC "to better

assess potential threats to the soundness of derivatives markets and thus the financial system of

the United States." *Id*. at 11,280.  As to the data collection requirements, the CFTC noted that it

believed that the registration requirements are "necessary to fulfill [the CFTC's] obligation" as a

member agency of FSOC, which is tasked by Dodd-Frank "with mitigating risks to the financial

stability [of] the United States." *Id*. at 11,281. The CFTC stated that "[t]hese regulations

improve the ability of the Commission to oversee the derivatives markets," and that "the

Commission will be able to better understand any risks posed to the financial system as a whole

arising from markets under the Commission's jurisdiction." *Id*.

Fifth, the CFTC considered the Final Rule in light of "other public interest

considerations," concluding that for both the registration and data collection requirements, that it

"has not identified any other public interest considerations impacted by the registration of

additional CPOs and CTAs," *id*. at 11,280, or "by this data collection initiative," *id*. at 11,281.

In sum, the CFTC not only outlined its consideration and evaluation of each of these

factors under Section 15(a), but more broadly outlined its assessment of the benefits and costs of

the Final Rule, as the Court has addressed *supra* in considering the plaintiffs' various interrelated

arguments.  While the CFTC did not calculate the costs of the Final Rule down to the dollar-and-

cent, it reasonably considered the costs and benefits of the Final Rule, and decided that the

benefits outweigh the costs.  The Court is satisfied that the agency's reasoning was not arbitrary

and capricious.

The plaintiffs are not satisfied, however, and attempt to analogize the CFTC's

consideration of the costs and benefits in this case with the SEC's recent attempts at cost-benefit

analysis, which have resulted in a series of recent D.C. Circuit cases invalidating SEC rules.  *See*

*Bus. Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011); *Am. Equity Life Ins. Co. v. SEC*, 613

F.3d 166 (D.C. Cir. 2010); *Chamber of Commerce v. SEC*, 412 F.3d 133 (D.C. Cir. 2005).  Each

of these cases is distinguishable, and the Court will discuss them in turn.

First, the Court turns to *Chamber of Commerce v. SEC*, 412 F.3d 133 (D.C. Cir. 2005).

There, petitioners challenged two provisions of a rule requiring that an investment company

"must have a board (1) with no less than 75% independent directors and (2) an independent

chairman."  *Id*. at 136.  While the Court found that the SEC had not "exceed[ed] its statutory

authority in adopting the two conditions" and that the "Commission's rationales for the two

conditions satisf[ied] the APA," the Court determined that the SEC violated the APA "by failing

adequately to consider the costs mutual funds would incur in order to comply with the

conditions" as well as by failing to consider adequately a proposed alternative to the conditions.

*Id*.

With respect to the condition that a board have no less than 75% independent directors,

the SEC claimed that it did not have a "reliable basis for determining how funds would choose to

satisfy the [condition] and therefore it [was] difficult to determine the costs associated with

electing independent directors."  *Id*. at 143 (quoting 69 Fed. Reg. 46,378, 46,387).  As the

*Chamber of Commerce* Court noted, "[t]hat particular difficulty may mean the Commission can

determine only the range within which a fund's cost of compliance will fall, depending upon how it responds to the condition but, as the Chamber contends, it does not excuse the Commission from its statutory obligation to determine as best it can the economic implications of the rule it has proposed." *Id.* Similarly, as to the second challenged provision, the SEC claims that it had no "reliable basis for estimating those costs." *Id.* at 144 (quoting 69 Fed. Reg. at 46,387 n.81). In response, the Court noted that "uncertainty may limit what the Commission can do, but it does not excuse the Commission from its statutory obligation to do what it can to apprise itself — and hence the public and the Congress — of the economic consequences of a proposed regulation before it decides whether to adopt the measure." *Id.* In other words, in that case, the SEC simply made no effort to calculate the costs and only opined that doing so would be difficult.

In contrast to *Chamber of Commerce*, in this case, the CFTC did "apprise itself – and hence the public and the Congress" of the costs of the Final Rule. *Id.* As discussed above, *see supra* Section IV(A)(2) of this Memorandum Opinion, where it was possible for the CFTC to make estimates about the actual costs of the Final Rule, the CFTC did so, and the CFTC further identified the source of additional costs and estimated the average annual compliance time. Thus, unlike the SEC in *Chamber of Commerce*, the CFTC made efforts and articulated the estimated costs of the challenged sections of the Final Rule. Therefore, the CFTC fulfilled its statutory obligation to consider and evaluate the costs of the Final Rule, and made a reasoned, informed decision that the benefits of the Final Rule outweighed these costs.

Second, the Court turns to *American Equity Investment Life Insurance Company, et al. v. SEC*, 613 F.3d 166 (2009). The plaintiffs argue that "it is the regulatory error identified in *American Equity* that the CFTC's error in this case most resembles." Pls.' Resp. at 5. In

*American Equity*, petitioners challenged an SEC rule stating that fixed indexed annuities are not annuity contracts within the meaning of The Securities Act of 1933, 15 U.S.C. §§ 77a *et seq.*, thereby subjecting fixed indexed annuities to the requirements under the Act. *American Equity*, 613 F.3d at 167. In relevant part, the petitioners challenged the SEC with respect to its statutory obligations to "consider the effect of the new rule on efficiency, competition, and capital formation." *Id.* The D.C. Circuit found that the SEC had not considered these factors, and, on that basis, vacated the rule. *See id.* at 167-68.

This case is distinguishable for three primary reasons. First, and most fundamentally, the SEC in *American Equity* stated that it "was not required to undertake such an analysis [of efficiency, competition, and capital formation] when it promulgated" the rulemaking at issue. *Id.* at 177. While the agency did address, in part, some of these factors, its assumption that it was not required to do so naturally would have informed the administrative process, and its consideration of all the factors was weak, or non-existent. The *American Equity* Court found, for example, that while "[t]he SEC purports to have analyzed the effect of the rule on competition, [it] does not disclose a reasoned basis for its conclusion that [the rule] would increase competition." *Id.* In contrast, in this case the CFTC was well aware of its obligations under the CEA and, in addition to a broad analysis of the costs and benefits of the Final Rule, set out its specific analysis for each of the five factors in the CEA test for each aspect of the Final Rule. Second, in *American Equity*, the rule at issue was filling a regulatory vacuum, with the SEC stating that the rule would "bring about clarity in what has been an uncertain area of law." *Id.* (quoting Final Fixed Indexed Annuities Rule, 74 Fed. Reg. 3138, 3171). The *American Equity* Court rejected the SEC's reasoning, stating that the SEC "cannot justify the adoption of a particular rule based solely on the assertion that the existence of a rule provides greater clarity to

an area that remained unclear in the absence of any rule." *Id*. at 177-78.  The instant case

presents a very different situation; the Final Rule here does not introduce an entirely new

regulatory framework to previously unregulated activity, but instead simply removes a blanket

exclusion, which was added relatively recently, to re-instate a requirement that RICs operating as

CPOs comply with CFTC regulation of CPOs.  Moreover, as explained in detail *supra*, the CFTC

provided a coherent, reasoned justification for reactivating this regulation for RICs.

Finally, *American Equity* is distinguishable because there, the agency made no finding

regarding the "existing level of competition in the marketplace under the state law regime."  *Id*.

at 178.  The plaintiffs argue in particular that the CFTC, like the SEC in *American Equity*, failed

to "determine whether, under the existing regime, sufficient protections existed."  Pls.' Mem. at

22 (quoting 613 F.3d at 179).  The plaintiffs note that in *American Equity*, the SEC failed to

assess an issue raised by commenters regarding the degree to which state regulatory systems

already regulated fixed indexed annuities.  *See id*. at 25.  The plaintiffs argue that, similarly, the

CFTC in this case failed to fulfill its obligations under Section 15 of the CEA by not assessing

the "extent to which existing regulation *already* protects investors and *already* provides the

benefits of transparency."  *Id*. at 26 (emphasis in original).  The Court disagrees.  As the Court

has noted, the CFTC *did* consider whether RICs were otherwise regulated, and concluded that

CFTC regulation was necessary given the changed context following the financial crisis, Dodd-

Frank, and, *inter alia*, a call from the major futures association, the NFA, for more regulation of

RICs.  Indeed, the CFTC considered the SEC's existing regulations and explained that the SEC,

by its own assessment, "had not developed a 'comprehensive and systematic approach to

derivatives related issues'" and that SEC controls "lose their effectiveness when applied to

derivatives."  77 Fed. Reg. at 11,255.  Furthermore, in this case, the CFTC acknowledged

industry concerns about potentially overlapping regulation and agreed to work with the SEC on harmonizing their regulatory approaches.  *Id*. at 11,255.  Thus, unlike in *American Equity*, the CFTC made not only a full acknowledgment of the existing regulatory regime, but is engaged in an ongoing effort by the agency to harmonize with existing regulations, where possible and appropriate, the CFTC's regulation of RICs.  This reasoned analysis is in sharp contrast to the SEC's purposeful ignoring as "not relevant" concurrent state regulation in *American Equity*.  *See* 613 F.3d at 178.

Finally, the Court turns to *Business Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011), the most recent of the SEC line of cases that the plaintiffs suggest should govern this Court's decision.  Specifically, the plaintiffs contend that the CFTC's cost-benefit analysis here "is very similar" to *Business Roundtable*, Pls.' Mem. at 27, where the D.C. Circuit again vacated an SEC rule.  In *Business Roundtable*, the petitioners challenged an SEC rule requiring public companies to inform shareholders with information regarding, and their ability to vote for, shareholder-nominated candidates for the boards of these companies.  *See* 647 F.3d at 1146.  The petitioners there argued that the SEC acted arbitrarily and capriciously by failing to fulfill its statutory obligation to "determine the likely economic consequences of Rule 14a-11 and to connect those consequences to efficiency, competition, and capital formation," and the D.C. Circuit agreed.  *Id.* at 1148.

The plaintiffs here are principally concerned that, as in *Business Roundtable*, the CFTC "failed adequately to address whether the regulatory requirements of the [Investment Company Act] reduce the need for, and hence the benefit to be had from" the Rule or the "probability the rule will be of no net benefit as applied to investment companies."  Pls.' Mem. at 27-28 (quoting 647 F.3d at 1154-55).  They note that, while the CFTC relied on "two purported benefits," the

CFTC "failed to determine whether either was already provided by existing regulation." *Id*. at

35.  In lobbing this critique, however, the plaintiffs ignore that the CFTC *did* consider other

regulations in place governing RICs, and still concluded that the CFTC's regulations were

necessary.  Furthermore, the CFTC promulgated a rulemaking to harmonize the compliance

obligations under part 4 of the CFTC's regulations with the requirements of the SEC for RICs.

*See* 77 Fed. Reg. 11,259; 77 Fed. Reg. 11,345.  Unlike in *Business Roundtable*, then, the CFTC

not only considered what regulations were already in place but committed itself to streamlining

the agency's compliance requirements.  This shows that, unlike the SEC in *Business Roundtable*,

the CFTC considered and evaluated whether other regulatory requirements "reduce the need for,

and hence the benefit to be had from" registration and reporting requirements with the CFTC.

647 F.3d at 1154.

Furthermore, in *Business Roundtable*, the SEC did not quantify the costs of its rule and

"arbitrarily ignored the effect of the final rule upon the total number of election contests." *Id.* at

1153.  In other words, the agency's Adopting Release "[did] not address whether and to what

extent Rule 14a-11 will take the place of traditional proxy contests." *Id.*  In this case, by

contrast, the agency clearly had estimated the number of entities – 416 – that would be affected

by the Final Rule, *see* 77 Fed. Reg. 11,345, 11,349, and gave due consideration to the costs of

the rule.[33]  Thus, these cases are distinguishable.

In sum, the Court finds plainly distinguishable the SEC line of cases on which the

plaintiffs heavily rely.  In these three cases, the SEC had not considered costs in a reasonable or

responsible way.  Here, in contrast, the CFTC adequately identified, considered, and evaluated

---

[33] The CFTC clarified following the motions hearing that the estimate of 416 affected entities was likely higher than the true number as it was calculated based on data preceding the adoption of the Alternative Net Notional Test.  *See* Def. CFTC's Notice of Clarification Regarding the Alternative Net Notional Test and Submission of Citation, ECF No. 37 at 2.

the costs and benefits of the Final Rule with respect to the five factors set out in CEA Section 15(a), 7 U.S.C. § 19(a)(2).  As the Supreme Court has explained, "[w]hen an administrative agency sets policy, it must provide a reasoned explanation for its action.  That is not a high bar, but it is an unwavering one." *Judulang v. Holder*, 132 S. Ct. 476, 479 (2011).  The CFTC provided a reasoned explanation for its actions, and properly considered and evaluated the benefits and costs of its proposed rule as it was required to do.

> **D.**     **The CFTC Offered the Public Sufficient Opportunity to Comment on the Proposed Rulemaking.**

Finally, the Court turns to the plaintiffs' argument that the Final Rule must be vacated because the CFTC violated the APA command that an agency "give interested persons an opportunity to participate in the rulemaking."  5 U.S.C. § 553(c).  Specifically, the plaintiffs argue that the CFTC improperly identified seven new factors that would guide the application of the marketing restriction but that "[t]hese factors were not identified in the initial rule proposal."  Pls.' Mem. at 10.  Although these factors were proposed by commenters (including ICI), an agency cannot "bootstrap notice from a comment." *AFL-CIO v. Donovan*, 757 F.2d 330, 340 (D.C. Cir. 1985) (quoting *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983)).

The defendant counters that its discussion of these factors is "not a rule" but, rather, is a "statement of policy with respect to how the Commission will evaluate compliance with Rule 4.5."  Def.'s Mem. at 19.  The Court agrees.  "'An agency satisfies the notice requirement, and need not conduct a further round of public comment, as long as its rule is a "logical outgrowth" of the rule it originally proposed.'" *Am. Coke & Coal Chems. Inst. v. EPA*, 452 F.3d 930, 938 (D.C. Cir. 2006) (quoting *Northeast Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 951-52 (D.C. Cir. 2004)).  Here, the CFTC responded to requests for clarification about the marketing

restriction, and responded by outlining the seven factors that would be an internal guide for the

agency in evaluating the restriction.  This was a logical outgrowth of the proposed rulemaking on

which comments were received.  Accordingly, the Court agrees that a notice and comment on

these precise marketing restriction factors was not required.[34]

*****

The plaintiffs have thrown everything in the proverbial kitchen sink at the CFTC in their

effort to stop the Final Rule, which will require RICs engaging in the financial activities of a

CPO to register with and report information to the CFTC, just as other entities covered by the

CPO definition are required to do, unless excluded under Section 4.5.  For the reasons explained

above, the Court is not persuaded by their arguments.

Clearly, the plaintiffs disagree with the CFTC's conclusion that the costs of the Final

Rule — even if acknowledged to be substantial — pale in comparison to its benefits for the

integrity, transparency, and stability of the financial markets, and the concomitant protections for

consumers and market players.  The plaintiffs have invited this Court to use the agency's

obligation to conduct a cost-benefit analysis to delve impermissibly into agency policy

judgments and second-guess the CFTC's conclusion on the outcome of the cost-benefit analysis,

all under the rubric of the APA's traditional arbitrary and capricious standard.  This Court

adheres to long-standing precedent, however, that it must "review [an agency's] cost-benefit

analysis deferentially," *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir.

2012), and that "'a court is *not* to substitute its judgment for that of the agency.'"  *Consumer*

---

[34] The plaintiffs also argue that the notice of the proposed rulemaking was inadequate because its discussion of costs and benefits did not give commenters "adequate notice of the basis for the Commission's cost-benefit analysis." Pls.' Mem. at 44.  The Court finds this argument unavailing because the CFTC did sufficiently provide notice of its cost-benefit considerations. *See, e.g.*, 76 Fed. Reg. at 7988-89 (articulating cost-benefit analysis considerations and inviting public comment on cost-benefit considerations).

*Elecs. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003) (Roberts, J.) (emphasis added) (quoting *Motor Vehicle Mfrs. Ass'n of Am. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Indeed, this Circuit has emphasized that "cost-benefit analyses epitomize the types of decisions that are most appropriately entrusted to the expertise of an agency." *Church of Christ v. FCC*, 707 F.2d 1413, 1440 (D.C. Cir. 1983). The Court's role, instead, is "to determine whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Center for Auto Safety v. Peck*, 751 F.2d 1336, 1342 (D.C. Cir. 1985).

Thus, whether the benefits of the Final Rule outweigh its costs is within the sound discretion of the agency. The agency must only show the Court that it considered and evaluated the costs and benefits as it was required to do by statute.

The plaintiffs suggest that a recent line of cases in this Circuit — *Chamber of Commerce*, *American Equity*, and *Business Roundtable* — requires of this Court an even more exacting consideration of the CFTC's analysis of costs and benefits.[35] The Court rejects this suggestion, and finds those cases clearly distinguishable since the agency in those cases did not consider responsibly the costs of their proposed rules, while the CFTC here, by contrast, did. These cases

---

[35] Indeed, the plaintiffs are not alone in this view since commentators have interpreted this line of SEC cases as reflecting a shift by the D.C. Circuit to a more stringent, exacting standard for reviewing agencies' cost-benefit analyses. *See, e.g.*, Michael E. Murphy, *The SEC and the District of Columbia Circuit: The Emergency of a Distinct Standard of Judicial Review*, 7 Va. L. & Bus. Rev. 125, 163 (2012) (noting that the D.C. Circuit's analysis of the cost-benefit analysis in this line of SEC cases "puts the court on a path that veers widely from the traditional arbitrary and capricious review"); James D. Cox and Benjamin J.C. Baucom, *Symposium: Reshaping Capital Markets & Institutions: Twenty Years On: The Emperor Has No Clothes: Confronting the D.C. Circuit's Usurpation of SEC Rulemaking Authority*, 90 Tex. L. Rev. 1811, 1813 (2012) (arguing that "the level of review invoked by the D.C. Circuit in *Business Roundtable* and its earlier decisions is dramatically inconsistent with the standard enacted by Congress" and noting the "conclusion . . . that the D.C. Circuit has assumed for itself a role opposed to the one Congress prescribed for courts reviewing SEC rules."); *Recent Case: Administrative Law – Corporate Governance Regulation – D.C. Circuit Finds SEC Proxy Access Rule Arbitrary and Capricious for Inadequate Economic Analysis*, 125 Harv. L. Rev. 1088, 1088 (2012) (noting that "[b]y parsing in fine detail the methods and results of the SEC's cost-benefit analysis, the [*Business Roundtable*] panel asserted judicial power in a field that courts struggle to oversee and applied an excessively exhausting standard that all but bars contested reforms"); Anthony W. Mongone, Note, *Business Roundtable: A New Level of Judicial Scrutiny and Its Implications in a Post-Dodd Frank World*, 2012 Colum. Bus. L. Rev. 746, 797-98 (2012) (noting that "[i]f allowed to stand, the *Business Roundtable* standard, which employs a level of intrusiveness far more extreme than those explicitly rejected in both the APA's predecessors and its subsequent amendments, has the potential to essentially paralyze the SEC in implementing the sweeping financial reforms introduced in Dodd-Frank").

confirm that this Court should apply an arbitrary and capricious standard in determining whether an agency has considered the costs and benefits of a proposed rule pursuant to a statutory mandate.

The CFTC fulfilled its obligation under the CEA to consider the costs and benefits of its proposed rule.  The Court is satisfied that the CFTC considered the relevant factors, acted well within its discretion, and that there was nothing arbitrary or capricious about the CFTC's actions in promulgating the Final Rule with respect to Sections 4.5 and 4.27.  Accordingly, this Court will not disturb the Final Rule.

## V.    CONCLUSION

For the reasons explained above, the Court will DENY the Plaintiffs' Motion for Summary Judgment, GRANT the CFTC's Motion to Dismiss in Part, and GRANT the CFTC's Cross-Motion for Summary Judgment.  An Order accompanies this Memorandum Opinion.

**DATED: December 12, 2012**

_____
BERYL A. HOWELL
United States District Judge